UNITED STATES, Appellee

v

VIRGIL ROARK, Private, U. S. Marine Corps, Appellant

8 USCMA 279, 24 CMR 89

*Lieutenant (jg) W. W. McNeilly, Jr.,* USNR, argued the cause for Appellant, Accused.

*First Lieutenant Daniel P. Reardon, Jr.,* USMCR, argued the cause for Appellee, United States.

### Opinion of the Court

GEORGE W. LATIMER, JUDGE:

Accused was brought to trial before a general court-martial upon charges of desertion and disobedience of straggler's orders, in contravention of Articles 85 and 92, Uniform Code of Military Justice, 10 USC §§ 885 and 892, respectively. Two specifications under the first charge alleged separated absences between November 25, 1955, and February 6, 1956, the first of some forty-seven days and the next of some seventeen days duration, both terminated by apprehension, and that each absence was without authorization and with the intent to remain away permanently. Accused pleaded not guilty to the desertion charge and specifications but guilty to the lesser included offenses of unauthorized absence under Article 86, 10 USC § 886. To the second charge and specification he entered a plea of guilty. The court found him guilty as charged and sentenced him to a bad-conduct discharge, total forfeitures, and confinement at hard labor for three years. The findings and sentence were approved by the convening authority, and a board of review affirmed save to reduce the confinement and forfeitures segments of the sentence to two years. The single error assigned in the petition to this Court concerns trial counsel's attempt to impeach the accused, who had taken the witness stand in his own behalf. That assignment becomes important since the basis for the attempted impeachment was accused's juvenile misconduct. Such evidence is claimed to have been incompetent and inadmissible and the cross-examiner's continual discussion and interrogation in regard to it prejudicial error.

In his direct testimony the accused, a member of the United States Marine Corps, stated that after he had already spent about six weeks at his home in Roanoke, Virginia, in an absence-without-leave status, he started back to the service. Money had been provided by his father for that purpose, but he had decided instead to visit his sister, who lived in Linden, New Jersey. He ran out of money in Philadelphia, Pennsylvania, but chanced to meet a "buddy" there who was a member of the United States Army. This friend had an automobile in which he hoped to return to his post at Fort Bragg, North Carolina. The accused decided the trip was alluring, and the pair took off for the South. Subsequently, his peregrination took him to North Carolina, where he was picked up by civilian authorities. He sojourned in the Fort Bragg stockade until receipt of his straggler's orders to return to Quantico, Virginia. Upon their receipt, he started a journey by train to that post but, during a stop at Richmond, Virginia, he left the train in quest of something to eat. He claims to have "blacked out" for about three hours in an alley, but thereafter he returned to his home in Roanoke. On the day before he was finally apprehended, he told his friends, with remarkable prescience, that he was returning to the service on the following day. Before he could get up the next morning to return, the authorities appeared and he was escorted to military control.

Trial counsel, in his cross-examination of the accused, sought to develop the facts surrounding accused's asserted meeting with the serviceman on the streets in Philadelphia. This brought to light the fact that the two men had first known each other at a school

280

which the witness named as the Beaumont Training School. Trial counsel asked what kind of school this was, but the law officer sustained defense counsel's objection to the question as being immaterial, despite trial counsel's assertion that the question was proper as the answer would cast light on accused's credibility. The matter was further pursued in an out-of-court hearing, and there trial counsel presented a letter from the Chief Probation Officer and Clerk of the Juvenile and Domestic Relations Court of Danville, Virginia, certifying that the accused had been committed to the State Board of Welfare and Institutions on January 22, 1953, after committing numerous offenses of larceny and breaking and entering. The law officer was referred to a provision of the Juvenile and Domestic Relations Court Law of the State of Virginia, which provided that: "no adjudication or judgment upon the status of any child under the provisions of this law shall operate to impose any of the disabilities ordinarily imposed by conviction for crime, nor shall . . . such adjudication be denominated a conviction," Code of Virginia, § 16.1–179. In pursuance of that statute, he ruled out any use of the letter on the theory that an adjudication by a juvenile court was not a conviction under the Virginia statute. However, he decided to permit cross-examination into any possible prior acts of misconduct or offenses by the accused during his minority which might have involved moral turpitude, including those which were the cause of the juvenile court proceedings, with the limitation that a denial by the accused was to be binding on the prosecution.

When court reconvened, trial counsel resumed his questioning of the witness as follows: "Roark, is it correct that you were committed to the State Board of Welfare and Institutions of the State of Virginia on the 22nd of January, 1953?" The accused answered, "Yes, sir." The defense objected, and the law officer sustained the objection and instructed the court members to disregard the question and answer. Trial counsel rephrased his questions several times, and, while he received no answers, either because of rulings by the

law officer or silence of the accused, we are sure the court-martial was permitted to consider that the accused was confined by the Juvenile Court because of having committed offenses involving moral turpitude. Part of the reason for that conclusion is drawn from the fact that the law officer tacitly conceded the admission of some testimony by instructing the court that the evidence sought from the witness as to his juvenile misconduct was solely for the purpose of testing his credibility; that it had absolutely no effect in any way to show a propensity to commit crime or the like; and that it was not for the purpose of determining his guilt.

Appellant assails the limiting instructions as being confusing and ambiguous and upon the ground that since the accused was the witness, there is a danger that the court used impeachment material as substantive evidence of his present guilt. We need only cite United States v Moore (No. 5026), 5 USCMA 687, 18 CMR 311, as dispositive of this contention. In that instance, instructions practically in these same words were approved by this Court in a situation where prior misdeeds of an accused were introduced for impeachment purposes. If the court members followed the instructions, they disabused themselves of any thought that guilt could be established by prior misconduct.

The question of real importance in this case is posed by accused's next assignment of error. He argues forcefully that the proceedings under the juvenile delinquency laws of Virginia are corrective in nature rather than penal and that records of juvenile adjudication are inadmissible for all purposes. The question is not stated quite accurately, for trial counsel was refused permission by the law officer to introduce in evidence any record of supporting documents. But the admissibility of the accused's previous acts of misconduct during his infancy is posed fairly and must be considered. To place the issue in its proper perspective, it is necessary to state that, in view of accused's guilty pleas, the only issue for the court to decide was

whether or not he had formed an intent to remain away permanently from the service during either or both of his unauthorized absences. That issue hinged on his credibility as a witness. His story was not implausible on its face, though it strained credulity. From what has been said, it necessarily follows that any improper impeachment would weaken his testimony and prejudice would result.

The question is not one of great difficulty to a State, for it can make its own laws with respect to ■ infancy and the manner in which its court may deal with juvenile court adjudications. A much more troublesome question is presented to us, for the laws of the various States are not uniform. However, before touching on that question, we will look into some policy considerations to determine whether it is wise to apply them in military law. The guiding social policy of the juvenile delinquency statutes which exist in better than half of the jurisdictions in this country is to reform the juvenile offender's wayward propensities rather than to punish him. If the rehabilitation process is successful, a fresh start for the minor is envisioned. To achieve this end, provisions have been incorporated in practically all such statutes that records of adjudications or convictions dealing with the disposition of a child are inadmissible in other cases. Other States hold that oral evidence to prove the adjudication or any evidence taken in the proceeding will not be admissible thereafter in the proceedings of other courts. The clear design in laying down those rules of exclusion is that the indiscretions of youth will not be used to brand him in later life, as happens in the case of adult recidivists. Some States in fact try to insure secrecy for juvenile offenses by providing that juvenile records will be destroyed after a certain lapse of time. See State v Guerrero, 58 Ariz 421, 120 P2d 798 (1942). In several other jurisdictions, including Virginia, although the protection from disclosure of the facts of a conviction or proceeding, in the background of minority, is not contemplated by statute, the courts have not permitted a witness or party testifying to be plied with questions calculated to resurrect such convictions or adjudications from out of their past, or to delve into the facts prompting the juvenile court to assume jurisdiction over the minor, even though the facts cast light upon their testimonial trustworthiness. These courts feel that this is but a logical interpretation of the statutes, excluding juvenile dispositions and proceedings. In a recent Virginia case, Kiracofe v Commonwealth, 198 Va 833, 97 SE2d 14 (1957), this line of reasoning was adopted to settle the question whether for the purpose of impeachment a witness might be asked about his juvenile adjudication. To quote from that case:

". . . The courts are not in agreement that under such statutes questions propounded a witness calculated to establish a conviction, or other substantive fact brought out before a juvenile court, are not allowable. Some exclude statements upon matters showing the substance of juvenile proceedings; while others allow an examination referring to such proceedings but not disclosing their substance. Annotation 147 ALR page 443, et seq.

"In the case of Thomas v United States, 74 App D.C. 167, 121 F2d 905, 908, the question here presented was considered and determined, and the court held that the complaining witness in a prosecution of a defendant for being the father of an illegitimate child, could not be cross-examined relative to her alleged arrest and trial for larceny, in a juvenile court, under a statute forbidding the use of such matter against the child 'in any case or proceeding in any other court.' In People v Smallwood, 306 Mich 49, 10 NW2d 303, 305, 147 ALR 439, the court took a somewhat more restricted view of the scope and effect of the privilege accorded by such statute, holding that while the juvenile records are not admissible, questions which do not refer to the 'disposition of the child,' but merely as to whether he or she had been in trouble with the juvenile authorities are admissible as bearing upon credibility.

"The question in the instant case, as framed, was not admissible. It referred to an adjudication in a juvenile court, that is, to the disposition of the child. It required a 'yes' or 'no' answer, and any follow-up of any inquiry into the records of the juvenile court would have been required to be excluded. Cf Malone v State, 130 Ohio St 443, 200 NE 473; State v Kelly, 169 La 753, 126 So 49; State v Guerrero, 58 Ariz 421, 120 P2d 798.

"In view of the provisions of our statutes, the court did not err in refusing to allow the defendant to ask the question above stated."

In the case of Thomas v United States, 121 F2d 905 (CA DC Cir) (1941), a similar problem confronted the appellate court. That court reasoned as follows:

"In the present case, the reason for refusal was even more imperative. The Juvenile Court has no jurisdiction to hear and determine an accusation of larceny except when the offense is charged to have been committed by a person under eighteen years of age. It may waive its jurisdiction in such a case if the child is sixteen years of age or older; in which event the other court which then takes jurisdiction will proceed in the regular manner of a criminal court. But if the child is under sixteen, or if the Juvenile Court retains jurisdiction of a child sixteen or over, it must proceed, not to a determination of guilt or innocence, but to 'an adjudication upon the status' of the child. Its procedure in making that adjudication is non-criminal in character. Consequently, such an adjudication of the Juvenile Court concerning a child—whether he may be voluntarily delinquent or merely the unfortunate victim of others—is in no sense the counterpart of a conviction in a criminal court; and none of the implications of conviction should result therefrom."

In Malone v State, 130 Ohio St 443, 220 NE 473 (1936), the court had a very similar issue before it, for there counsel sought to cross-examine an accused upon his juvenile adjudication or any incident connected therewith which might impeach his credit as a witness. There the court stated:

"Taking various of the questions and answers together, it is reasonably plain that defendant was being examined as to matters which had been the subject of proceedings in the juvenile court, and in which he had been a principal.

· · · · ·

"Under no circumstances could the state have introduced records from the juvenile court, proving or tending to prove, the commission of the acts implied in the questions asked defendant. Since the foundation upon which the questions in issue rested could not be exposed because of the inhibition of the statute, the questions themselves were barred by the same obstacle.

"These observations result in the conclusion that the trial court committed prejudicial error in allowing the state, especially over objection and protest of counsel, to inquire of defendant as to his past behavior, founded upon his juvenile court involvements."

The other side of the question has its supporters, among whom is Dean Wigmore. He has this to say:

". . . It would be a blunder of policy to construe these statutes as forbidding the use of such proceedings to affect the credibility of a juvenile when appearing as witness in another court. A typical delinquent is a girl of corruptive environment or nymphomaniac tendency; such a girl is often the cause of injustice to an innocent man by making false charges of rape or indecent liberties; . . . and the revelations in the juvenile court may be the best or even the only means of exposing the testimonal untrustworthiness of the witness." [Wigmore, Evidence, 3d ed, § 980 (7)].

In People v Smallwood, 306 Mich 49, 10 NW2d 303 (1943), 147 ALR 439, the Supreme Court of Michigan, relying on Wigmore, held:

"When the daughter was on the witness stand she was asked on cross-

**283**

examination whether she had not been in trouble with the juvenile authorities before. On objection, the court excluded the question, stating that the 'juvenile records are not admissible.' The applicable statute is as follows: 'A disposition of any child under this act, or any evidence given in such case, shall not in any civil, criminal or any other cause or proceeding whatever in any court be lawful or proper evidence against such child for any purpose whatever, except in subsequent cases against the same child under this act.' 3 Comp Laws 1929, § 12834, Stat Ann § 25.291. There is no question but that this salutory statute is for the purpose of protecting a child when it becomes a ward of the State. Its aim is 'to hide youthful errors from the full gaze of the public and bury them in the graveyard of the forgotten past.' State v Guerrero, 58 Ariz 421, 120 P2d 798, 802. It prohibits the use of juvenile court proceedings or evidence obtained therein against a child in any other court to discredit him as one possessing a criminal history. Malone v State, 130 Ohio St 443, 200 NE 473. However, in the present case there was no effort to impeach the child's character but rather to ascertain her credibility. . .

". . . The question as framed was proper and it should not have been excluded. As was stated in People v Cowles, 246 Mich 429, 224 NW 387, 388: 'We think the testimony should have been received, not in extenuation of rape, but for its bearing upon the question of the weight to be accorded the testimony of the girl and the question of whether the mind of the girl was so warped by sexual contemplation and desires as to lead her to accept the imagined as real, or to fabricate a claimed sexual experience.' "

When we consider the two lines of authorities, we believe it better to march with those decisions which are more in accord with present-day social thinking. In this instance, we need not concern ourselves with the area questioned by Dean Wigmore and People v Smallwood, supra, for here the accused

was the witness on his own behalf, and he was not seeking to prove the commission of a criminal offense by another person. There is no doubt that prior acts of misconduct shed light on the credibility of a witness, but there is a danger when they are introduced that the triers of fact may be diverted from the real issue and in many cases the necessity for taking that risk is not necessary. There are instances when it is, but in the case of minors the policy of protecting the infant outweighs the necessity of impeaching his veracity.

We recognize the contention that many States do not permit acts of misconduct not resulting in a conviction to be admitted in evidence, while military law accepts them as affecting credibility. We do not believe it necessary to carry that concept as far as juvenile delinquency is concerned, and we are fortified in our conclusion by the fact that Congress has recognized the juvenile problem. In Title 11, § 11–915, District of Columbia Code, 1951 Edition, we find the following:

"No adjudication upon the status of any child in the jurisdiction of the court shall operate to impose any of the civil disabilities ordinarily imposed by conviction, nor shall any child be deemed a criminal by reason of such adjudication, nor shall such adjudication be deemed a conviction of a crime, nor shall any child be charged with or convicted of a crime in any court, except as provided in section 11–914. The disposition of a child or any evidence given in the court shall not be admissible as evidence against the child in any case or proceeding in any other court, nor shall such disposition, or evidence or adjudication operate to disqualify a child in any future civil-service examination, appointment, or application for public service under either the Government of the United States or of the District of Columbia. (June 1, 1938, 52 Stat 599, ch 309, § 14.)"

Further support for our views may be gathered from the fact that Federal courts have construed the Federal Juvenile Delinquency Act to express the

same policy with regard to juvenile records, although the Act states no such exclusionary rule. 18 USC §§ 5031–5037. Demonstrative is United States v Fotto, 103 F Supp 430 (SD NY) (1952):

"The Juvenile Delinquency Act was inspired by several good purposes: Recognition of the fact that a person under the age of eighteen does not have mature judgment and may not fully realize the nature of his act or the consequences; also that he should not have to bear the stigma of a criminal for the rest of his life because of a violation of the law when he was young, and that he should be encouraged by proper supervision and a changed environment to become a law abiding citizen."

This case pointedly offers good reason to justify us in choosing the liberal rule. The State of Virginia seeks to protect its infants from disclosure of their youthful indiscretions. Trial counsel in a court-martial obtains written documents from the officers of that State which, if used, would defeat the purpose of the statute for the very reason that the accused's past record would be made public in a court sitting in that Commonwealth. If there is value in the nondisclosure statutes, which we concede, their worth can be easily destroyed by publication in military courts.

In the case at bar, the accused was fourteen and a half years old at the time of his juvenile delinquency, and he was over the age of eighteen when he committed these offenses. It may well be that there was no significant change in his habits, attitudes, or character during the three and a half years intervening between the misdeeds, but the immaturity of a fourteen and one-half-year-old boy argues against using his early predilections in a criminal proceeding after he reaches an age when society must charge him with the judgment, sense, and discretion of one who has reached his majority. If minors who have offended against the laws of society afterward outgrow their divergency, it may in some small measure be chargeable to the chance of starting anew which the juvenile delinquency laws espouse. Some of these boys will one day enter the military service, and a sound social policy recognized in many States should not be completely discarded when and if the boy, now a man in the eyes of the military, becomes an accused in a trial by court-martial. Remoteness and policy can both be touchstones of inadmissibility without serious injury to the system. The handicap to the Government in prosecutions in military courts is no greater than that placed upon district attorneys in many of our States, in the District of Columbia, and seemingly in Federal district courts. Once it is concluded the rule of inadmissibility is sound, we would not abide in the spirit which prompted such legislation if we permitted the same information to be brought out by cross-examination.

It is said that if we support the contentions of the accused, we will make the law difficult of application, for each State statute may have different conditions. We recognize there will be differences in the enactments, but they pose no insurmountable obstacle. It might be that in military courts, the line of demarcation between admissibility and inadmissibility of prior acts of misconduct is the age at which the services can enlist a member, or it may be that the State laws on infancy will become uniform. Those are matters which may concern us in the future, but they are not important in this setting. This accused was, as we have said, fourteen and a half years of age at the time he brushed with the juvenile authorities and, by the standards of any jurisdiction which has legislated on the subject, that is below the age which will permit proceedings to be used.

In this light, the law officer erred in permitting trial counsel to parade the fact before the court members that accused was committed by a juvenile court for the commission of acts involving moral turpitude. We have already decided that if this was error, the accused in this case was prejudiced.

It follows that the decision of the board of review is reversed. The record

is returned to The Judge Advocate General of the Navy for reference to a board of review, which may affirm convictions of the offenses to which the accused pleaded guilty and assess an appropriate sentence, or order a rehearing.

Judge FERGUSON concurs.

QUINN, Chief Judge (concurring):

The principal opinion is based upon policy considerations. In my opinion, the same result can be reached by relying upon a specific provision of the Manual for Courts-Martial. I prefer to predicate my action upon the latter because it avoids the "future" problems referred to in the principal opinion. See United States v Cambridge, 3 USCMA 377, 12 CMR 133.

The Manual for Courts-Martial, United States, 1951, provides as follows (paragraph 153*b*) :

"A witness may be impeached by showing that he has been convicted by a civil or military court of a crime which involves moral turpitude or is such as otherwise to affect his credibility."

The proceedings as to which trial counsel persistently attempted to cross-examine the accused were held in a civilian jurisdiction. Necessarily the nature of those proceedings is determined by the law of that jurisdiction. Here, the law of the jurisdiction provides that the early proceedings against the accused did not constitute a conviction for crime. Consequently, they do not meet the requirements of the Manual, and cannot be used for impeachment purposes.