UNITED STATES, Appellee

v

ROBERT S. LISCAR, Airman Second Class, U. S. Air Force, Appellant

11 USCMA 708, 29 CMR 524

No. 13,952

Decided July 29, 1960

*Captain Prichard E. Gray* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel James L. Kilgore* and *Major Charles K. Rush.*

*Major Simpson M. Woolf* argued the cause for Appellee, United States. With him on the brief was *Colonel John F. Hannigan*.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The Government concedes that trial counsel erred in attempting to impeach the accused, who testified in his own defense, by questioning him about a juvenile offense committed when the accused was eight years of age. United States v Roark, 8 USCMA 279, 24 CMR 89; see also United States v Moreno, 10 USCMA 406, 409, 27 CMR 480.[1] Consequently, the issue before us is whether, under the circumstances of the case the error presents a fair risk of prejudice to the accused. See United States v Humble, 11 USCMA 38, 40, 28 CMR 262; United States v Nicholson, 8 USCMA 499, 25 CMR 3.

Accused was brought to trial before a special court-martial on two charges. One alleged the larceny of a $33.00 money order; the other set out assault with a dangerous weapon.[2] At trial the prosecution showed that on September 18, 1958, Staff Sergeant W. E. Good purchased three postal money orders in the amounts of $50.00, $33.00, and $20.00. He mailed the $20.00 money order to his wife. He inserted the payee's name in the $50.00 money order, but left untouched the payee and purchaser blanks in the $33.00 money order; both orders were placed in a stationery box, which was left in his desk in the Recreation Building where he had his duty assignment. Sergeant Good last saw the money orders on the night of September 21. The next morning he discovered the box and the orders were missing. He searched the entire building and "consulted" each of the men working for him, including the accused. He assured his subordinates that if the money orders were returned no charges would be lodged. However, no trace was found of the box and the orders, and no one admitted having seen them. The accused told him he "didn't have it," and he was not the "type" of person who would take them.

Other evidence by the prosecution, and admissions by the accused in testimony offered on his own behalf, established that the $33.00 money order was cashed by the accused on September 23. He had inserted his own name as payee and a fictitious name as the purchaser. To account for his actions, the accused testified that he did not take the money orders. He said he found the $33.00 order among some papers around the trash cans outside the Recreation Building. For two or three days thereafter he "searched around the base on bulletin boards and things to see if anybody had lost it." On September 23 he took his family to a beach area about 30 miles away. Returning home in the late afternoon he found he needed gas. He discovered he had left his wallet at home and he had no money. The "only thing . . . [he] could think to do" was to cash the money order, which was in the glove compartment of his car. As far as he was concerned, it was his because he "hadn't heard of anybody losing it." He put down a fictitious name as the pur-

[1] Appellate defense counsel have not challenged the good faith or the propriety of trial counsel's motives and they have suggested that his inquiry was the result of "very bad judgment" or "ignorance of pertinent rules of evidence." United States v Johnson, 3 USCMA 447, 452, 13 CMR 3. The Government "commends" them for "their candor" and endorses the suggestion. We have no disposition to go behind the concession, but it is indeed surprising and lamentable that counsel certified as qualified should appear to be so uninformed on so fundamental a matter as the bases for impeachment of an accused. We repeat what we said in United States v Moreno, 10 USCMA 406, 409, 27 CMR 480: "[P]rosecutors would do well to exercise more discrimination in attempting impeachment."

[2] The accused was convicted of the larceny as charged, and assault and battery as a lesser offense to assault with a dangerous weapon.

**709**

chaser because "it would be pretty silly to write from Robert S. Liscar to Robert S. Liscar." He cashed the money order, and out of the proceeds paid three dollars for the gas. While "not positive what . . . [he] spent it for" he expended the remainder. Either the next day or the day after that he was asked by Sergeant Good if he had seen the stationery box and the money orders. He told the Sergeant he knew nothing about them since it was obvious that the Sergeant wanted restitution, and he could not, because of a deficiency in funds, return any of the money. Finally, the accused admitted that, although the order bore a printed serial number and a stamp indicating it had been issued at the Charleston Heights Station, Charleston, South Carolina, Post Office, he made no inquiry at the post office or at its branch; also he made no inquiry of anyone or of any place, although he "figured" that the loser would put a notice somewhere "or tell somebody that they had lost it . . . [like] the Air Police Section or . . . the Commander."

During cross-examination trial counsel suddenly asked the accused if he had stolen a "billfold containing $75.00 in April of '47." Defense counsel objected before the accused answered. What followed is set out below:

"Q: Now, Airman Liscar, do you realize everything you say before this court, the court is going to listen to with considerable care to determine whether or not you are telling the truth, don't you?

"A: Yes, sir.

"Q: Airman Liscar, did you steal a billfold containing $75.00 in April of '47?

"DC: Objection.

"TC: Basis for the objection?

"DC: The man is here being tried on these two charges and all of a sudden the trial counsel is going to come in with I don't know what.

"TC: Yes, I do know what. Actually, it's a crime involving moral

turpitude and crimes involving moral turpitude result in a person being able to be impeached as to his credibility on the stand. When the accused takes the stand as a witness, he subjects himself to the same type of impeachment as does any other person and, if, therefore, a person has been convicted of a crime or if a person has committed a crime involving moral turpitude—and I suggest that the taking of a billfold containing $75.00 is quite—

"DC: What date?

"TC: 4–2–47. Now I suppose that's April the 2nd, 1947.

"DC: I object to the question on the grounds that, first of all, it is irrelevant and does not belong here now, and second of all, how old are you today?

"ACCUSED: I'm 20, sir. In '47 I was 7 or 8 years old.

"DC: I object to the question, period. The man was a juvenile.

"TC: What is the objection—that he was too young to understand a crime involving moral turpitude, or it is improper to have any crimes before—

"PRES: Let's hold it right now. Subject to any objection by any member of the board, the objection is sustained.

"TC: I would like to ask for an explanation of the ruling for additional purposes—was it too long ago, or do you believe that it is improper to bring in any evidence of any crimes involving moral turpitude?

"PRES: Probably it is both—the fact that it is too long ago and it is irrelevant.

"TC: It is not.

"LT. CONNOLLY: I would like to say, sir, that I feel it is relevant only it is too long ago—

"PRES: You have had your chance to object.

"TC: I will ask Airman Liscar another question which might provoke another objection and a ruling.

"DC: I ask for a ruling by the court to stop the trial counsel from continuing this line of questioning that he has just started.

"PRES: Let's close the court.

. . . . . .

"PRES: Let me recap what happened here prior to closed session. The defense counsel objected to the line of questioning being brought out by the trial counsel. His objection was sustained, that is the defense counsel's objections were sustained. The motion requested by the defense counsel was to determine the credibility of the line of questioning insofar as bringing out past history of the witness. In closed session the court decided that the history can be brought out from the time of the individual's service date—his entry into the service—until the present date, and nothing past that.

"TC: Prior to findings? The ruling of the court—prior to findings nothing prior to his entrance into the service would be admissible?

"PRES: Admissible. Now, as a point of law in regard to the top part of the sheet which I have here which contains the charges and specifications, is this information available to the court at this time, or will it be—

"TC: It will not be made available until immediately after findings. If there is a conviction, that information will be given to the court at that time, but not prior.

"PRES: Why is it not available?

"TC: This is normally considered personal data which should not be considered in determining the guilt or innocence of the individual. It has nothing to do with testing the credibility of a person on the stand as a witness.

"PRES: Specifically, now the previous convictions—

"TC: There will be no evidence of previous convictions admitted, if any, until after findings; however, I will state for the record that the accused has no record of previous military convictions. Although I'm not certain it is proper to do this, I cannot see how the accused can be prejudiced by this, so, therefore, I will state that there is no record of previous military convictions.

"PRES: The court is not supposed to know this information.

"TC: I can see no harm in the court knowing it. It certainly cannot prejudice the accused.

"PRES: At any rate, the question —the objection was sustained and you may now proceed.

"TC: No further questions."

Since the accused admitted cashing the money order, his guilt or innocence depended substantially upon whether the court-martial believed his account, or whether it concluded he was lying. Obviously, trial counsel believed it was important to get before the court-martial evidence of the accused's previous involvement in a larceny; he specifically called attention to the "considerable care" which the court would give to "everything" the accused said. This trial level evaluation of the importance of the matter cannot be lightly disregarded on appeal. United States v Cruz, 10 USCMA 458, 461, 462, 28 CMR 24; United States v Kloh, 10 USCMA 329, 333, 27 CMR 403. The discussion leaves no room to doubt that, while the accused had no previous military convictions, there had been judicial proceedings against him, including one for the theft of a billfold. The Government makes much of the fact that the accused never answered the question, but the form of the question was in the nature of "an affirmative statement not simply an interrogation." United States v Russell, 3 USCMA 696, 702, 14 CMR 114. Coupling this with trial counsel's argument on the president's ruling, and his reference to other questions "which might provoke . . . objection," it unmistakably appears that trial counsel possessed damaging information about the accused. See United States v Russell, supra. Under the circumstances, the incident, in our opinion, seriously

undermined the accused's credibility and deprived him of a fair trial. See United States v Richard, 7 USCMA 46, 21 CMR 172.

The decision of the board of review as to Charge I and the sentence is reversed. The findings of guilty of Charge I and the sentence are set aside, and the record of trial is returned to The Judge Advocate General for resubmission to the board of review. In its discretion, the board of review may reassess the sentence on the basis of the findings of guilty of Charge II or direct a rehearing on Charge I and the sentence.

Judge FERGUSON concurs.

LATIMER, Judge (dissenting):

I dissent.

There can be no doubt, indeed the Government concedes, that it was error for trial counsel to inquire regarding accused's alleged juvenile misconduct. The point upon which I must part company with my brothers is that of prejudice.

In United States v Shaughnessy, 8 USCMA 416, 24 CMR 226, we were also concerned with cross-examination of an accused for a juvenile conviction. There, Judge Ferguson authored the opinion for a unanimous Court on that issue. We held, in light of a cautionary instruction by the law officer to disregard completely the im-

proper questioning, and in the absence of any indication of bad faith on the part of trial counsel, that there was no risk that the findings were influenced.

The instant case was tried by special court-martial, and the pertinent proceedings are set forth in the majority opinion. It is to be noted that the question went unanswered, and that the court sustained defense counsel's objection. Moreover, when the colloquy over the matter continued, the court-martial closed and decided that nothing prior to the date of accused's entry into the service could be considered. Here, then, we have a conclusive showing the court members would pay no heed to the improper question. Indeed, since this was a special court-martial it would constitute but an empty and meaningless formality for them to instruct themselves to disregard that which they had already voted not to consider. In addition, the defense here expressly declines any contention that trial counsel acted with improper motive or in bad faith. With the record in that posture, I find it most difficult to understand the basis upon which my associates distinguish our decision in Shaughnessy, supra, in assessing the impact of the error.

I would affirm the decision of the board of review.