UNITED STATES, Appellee

v

JOSEPH A. MILLER, JR., Airman Second Class, U. S. Air Force, Appellant

14 USCMA 412, 34 CMR 192

No. 17,031

March 6, 1964

*Major Hugh J. Dolan* argued the cause for Appellant, Accused. With him on the brief was *Colonel Daniel E. Henderson, Jr.*

*Colonel Emanuel Lewis* argued the cause for Appellee, United States.

## Opinion of the Court

KILDAY, Judge:

Accused fell into the toils of the law during his tour of service at Anderson Air Force Base, on Guam. Tried by a general court-martial convened on that island, he pleaded not guilty to all charges and specifications. He was acquitted of one count of housebreaking in accordance with his plea. However, the court-martial found him guilty of two other violations of Article 130, Uniform Code of Military Justice, 10 USC § 930, and two larcenies, violative of Article 121, Uniform Code of Military Justice, 10 USC § 921—the latter crimes having been committed in the course of the housebreakings of which accused was convicted. He was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for three years.

Such findings and sentence were approved by the convening authority, and affirmed by a board of review. Thereafter, pursuant to Article 67(b)(2),

Uniform Code of Military Justice, 10 USC § 867, The Judge Advocate General of the Air Force certified the record to this Court, requesting our action on the following issue:

> Was the board of review correct in its determination that accused's testimony on direct examination, although announced as limited to the issue of voluntariness of his extrajudicial statement, opened the subject of accused's guilt to cross-examination?

Subsequently, accused filed a petition for grant of review, seeking that we invoke our discretionary authority under Article 67(b)(3), Uniform Code of Military Justice, supra. We elected to hear arguments on the following issue, assigned by appellate defense counsel as error:

> Did the law officer abuse his discretion in allowing matters of prior misconduct by accused, inflammatory

**413**

and prejudicial to him, to be brought to the attention of the court-martial?

We shall treat with the two issues seriatim. Before we commence our discussion, however, some recitation of facts will be helpful for proper understanding of the questions posed.

The record reflects that shortly before Christmas 1962, a building at Anderson Air Force Base was broken into by someone who removed louvers from a window to effect his entry. It was determined that a wrist watch was missing.

On the evening of February 9, 1963, a suspicious individual was seen near the base exchange. The witness noticed that a bulletin board near the entrance was broken and some louvers were on the ground. Accordingly, he alerted the authorities. It was almost 10:00 p.m. when the air police were notified. They immediately responded to this call and hurried to the scene. Noise was heard from inside the exchange, and the premises were "staked out." This action was fruitful, for very shortly accused was caught as he lifted the broken bulletin board and emerged through the aperture from which the wooden slats were missing. Accused attempted to discard two articles of feminine apparel he was carrying, but they were recovered.

An agent of the Office of Special Investigations was thereupon notified. He arrived at the exchange about 10:25 p.m. and, after checking the scene, he proceeded to an air police office to interview accused. According to the agent, accused, after proper warning, made a voluntary oral statement. He initially asserted two Guamanians had coerced him to enter the base exchange with them at gunpoint. However, when the agent evinced disbelief, accused freely admitted that story was a fabrication, and orally confessed unlawfully entering by himself and taking the mentioned garments.

An authorized lawful search of accused's room on the following day turned up a watch fitting the description of the one missing from the December break in. Despite accused's protest that it was a present, the watch was seized. Subsequently, on the same day, accused was once more appropriately warned and interviewed. He furnished a sworn written confession detailing his guilt of both housebreakings and larcenies.

Such additional matters as are germane to resolution of the issues will be set forth in the course of our discussion of each.

I

At the time the written confession was offered into evidence by the prosecution, the defense interposed an objection and claimed both the written statement and the oral one made the night before were involuntary and inadmissible. Toward that end, defense counsel put accused on the witness stand for the limited purpose of testifying as to the circumstances of the taking of his confession, to contest the voluntary nature thereof. On cross-examination, trial counsel was permitted to ask accused—as the defense paraphrases the inquiry in its brief— "whether the special agents were mistaken about his breaking and entering."[1] Over strenuous objection by

[1] The critical questions put to accused on cross-examination, and his answers, were as follows:

"Q. Now you make reference to telling Mr. Sankey the story about the Guamanians forcing you into the BX at gun point. Do you remember telling him that?

"A. Yes, sir.

"Q. That was a lie, wasn't it?

"A. Yes, sir.

"Q. Why did you tell him that lie?

"A. I guess I needed some excuse.

"Q. Some excuse for what?

"A. For what had been done.

"Q. For what?

"A. For what had been done.

"Q. What had been done?

"A. They accused me of breaking and entering.

"Q. They accused you?

"A. Yes, sir.

"Q. Were they mistaken?

"A. No, sir.

"DC: Objection. That is a highly improper question to ask.

"LO: The objection is overruled. .

the defense, the question was allowed, and accused replied "No, sir."

Before the board of review, appellate defense counsel asserted that the law officer erred in permitting the above cross-examination of accused, who was testifying only upon the limited subject of voluntariness of his pretrial statements. The board rejected the assignment of error. It concluded that accused's testimony on direct examination, although announced as being limited in scope, in fact opened the subject of accused's guilt to cross-examination. The propriety of that conclusion by the board of review is the inquiry that The Judge Advocate General has certified to this Court.

There can be no question of an accused's right to take the stand for the purpose of contesting the voluntariness of a pretrial statement or confession, and to limit his testimony to that area without subjecting himself to cross-examination on other matters concerning the merits generally, or the truth or falsity of his admissions. United States v Haygood, 12 USCMA 481, 31 CMR 67; United States v Wannenwetsch, 12 USCMA 64, 30 CMR 64; United States v Hatchett, 2 USCMA 482, 9 CMR 112; United States v Webb, 1 USCMA 219, 2 CMR 125; Manual for Courts-Martial, United States, 1951, paragraphs 140a and 149b (1), pages 250 and 280. Equally well settled, however, in cases where an accused purports to limit the scope of the evidence he gives, is the rule that "the content of the testimony upon direct examination and not the announcement of his limiting his testimony . . . [will] control." United States v Kauffman, 14 USCMA 283, 299, 34 CMR 63. And if the accused in his testimony touches on the general issue of his guilt or innocence, he opens the door to cross-examination on such matters about which he testified on direct examination. United States v Kauffman, supra; United States v Wannenwetsch, supra; United States v Kelly, 7 USCMA 218, 22 CMR 8; United States v Hatchett, supra.

The question will stand, and so will the answer."

The parties do not dispute the validity of the above principles. Rather, the disagreement is over the board of review's evaluation of accused's testimony on direct examination, in holding he opened the door to trial counsel's question. In our judgment, the board's determination was correct.

On direct examination accused recounted his activities on the night of February 9, 1963. He testified that he attended a beach party that evening, at which he imbibed a large quantity of alcohol. Accused remembered leaving the party about 9:00 p.m. with some of his companions, but did not recall arriving at his barracks.

In this connection, we note accused's story was corroborated in substantial part by other witnesses. According to their testimony, accused drank heavily at the party, and became so boisterous and drunk that he was asked to leave. His friends took him from the beach to his barracks where one put accused to bed because he was so intoxicated. This friend then waited outside accused's room and smoked a cigarette to make sure accused did not get back up, but departed after he concluded accused had "passed out."

Accused remembered being taken to the air police office on the night of February 9th, and being questioned by the Office of Special Investigations agent. Although he claimed he was "groggy and unsteady," accused acknowledged that the agent warned him of his rights, and that he understood the same. Accused further testified that he told the agent the story about the two Guamanians forcing him to enter the exchange at gunpoint. He remembers recanting and telling his interrogator this story was untrue, but accused testified he did not recall telling the agent anything further. The following portion of the transcript reflects accused's response when his counsel inquired what he recalled telling the investigator:

"Q. What do you remember of what you told him?

Other facts set forth hereinafter will serve to place this testimony on cross-examination in perspective.

"A. I told him that story.

"Q. You remember telling him that?

"A. Yes, sir.

"Q. Do you remember telling him anything else?

"A. Nothing.

"Q. Do you remember saying anything that Mr. Sankey testified to on the stand with reference to the offense at the BX?

"A. Yes, sir.

"Q. Pardon?

"A. Yes, sir.

"Q. What do you remember?

"A. That he read me Article 31, asked—told me what I had done, and asked me why I did it.

"Q. What did you tell him?

"A. I told him that story, denied it.

.    .    .    .    .

"Q. Do you recall making any admissions relative to the BX break-in?

"A. Well, at first I told them the story, and after a while I re-denied what I said.

"Q. Did you say anything with reference to that BX break-in that you can recall at this time?

"A. No, sir.

"Q. Other than the story that Mr. Sankey related about the Guamanians?

"A. Yes, sir."

Thus, it would appear that the theory the defense was attempting to raise is that accused was so drunk as to be unable to give the Office of Special Investigations agent a voluntary statement. It is evident the attempt died aborning, however, for accused admitted that he was given proper warning under Article 31 and understood the same. Likewise, he recited a number of other details concerning the interview. Further, we point out that the protests accused sought to raise as to the oral confession of February 9th do not apply to the written confession made the next day, when for the first time he admitted his complicity in the crimes involving the watch.

Accordingly, no issue as to the admissibility of accused's confessions was reasonably raised by the evidence.[2] To the contrary, and notwithstanding the purported limitation the defense asserted as to it, the thrust of accused's testimony was to the merits of the prosecution.

First, accused's story tended to establish that he was so intoxicated as to be able to remember nothing whatever during the critical period between the time he left the beach and the time he was at the air police office for questioning—the period during which two specific intent crimes were shown to have been committed. To be sure, accused's inebriated condition was corroborated by other evidence but, just as certainly, his intoxication was put before the triers of fact through accused's own lips. This issue affecting the general issue of larceny and housebreaking charges was argued to the court-martial by defense counsel, and was properly instructed upon by the law officer.

Further, accused's testimony on direct examination touched the merits in a second way. At the same time he attempted to show he was too drunk to make a voluntary statement, and did not recall making the one to which the Office of Special Investigations agent testified, accused effectively contended that the statement was in fact conjured up by the investigator. Reference to the testimony quoted hereinbefore shows that accused judicially denied making the incriminating extrajudicial statement attributed to him. Indeed, once again the argument of the defense position at trial is illuminating. Accused's counsel asserted:

". . . there is the contention by Mr. Sankey, who interviewed the accused at the APO office on 9 February 1963, that he got an oral admission relative to the BX break-in

---

[2] The law officer's instruction on voluntariness was a gratuitous windfall to accused, apparently given out of an abundance of caution.

and larceny. There is a denial on the accused's part. He recalls giving them a phoney story, but he does not recall telling them that he did it. He states he denied it."

The situation presented is analogous to that recently before this Court in United States v Cotton, 13 USCMA 176, 32 CMR 176. There we distinguished between matters bearing on truthfulness and credibility, and voluntariness and admissibility. We pointed out that attacks on the truthfulness of a statement generally went to weight, not admissibility. In the case at bar, as we have previously noted, no issue as to admissibility was reasonably raised by the evidence accused gave. But that does not dilute in anywise the impact of his testimony on the weight to be accorded extrajudicial admissions which he denied making, concerning events he asserted he could not remember. See United States v Walbert, 14 USCMA 34, 33 CMR 246; United States v Cotton, supra; United States v Ledlow, 11 USCMA 659, 29 CMR 475; United States v McQuaid, 9 USCMA 563, 26 CMR 343; United States v Spivey, 8 USCMA 712, 25 CMR 216.

For this additional reason also, therefore, it is clear that accused opened the door to cross-examination touching the general issue. Accordingly, the certified question must be answered in the affirmative.

## II

We turn next to the issue upon which we granted accused's petition for review. It also arose during trial counsel's cross-examination of accused, after the occurrence of the events previously discussed. In purporting to undermine accused's truthfulness the prosecutor asked him whether he had stolen any money or other articles while stationed at the Guam base. Once more the defense objected, but to no avail, and the law officer permitted the questioning on the basis that accused's credibility was in issue. In response, accused admitted stealing a dollar from a little girl in a theatre and theft of two other feminine garments.

Very recently, in United States v Robertson, 14 USCMA 328, 34 CMR 108, we considered the same problem as is now before us, and that decision is controlling. We there concluded that specific acts of misconduct not resulting in conviction of a felony or crime of moral turpitude are not the proper subject of cross-examination for the purpose of attacking the credibility of an accused as a witness. Cf. Walder v United States, 347 US 62, 98 L ed 503, 74 S Ct 354 (1954). As in *Robertson*, there is no showing that accused was convicted of the offenses he admitted. Accordingly, we hold that the law officer erred in permitting this cross-examination over the defense's protest.

Reversal of all the findings, however, is not required. With regard to the pair of offenses of February 9th, there is no fair risk that trial counsel's cross-examination about other misconduct prejudiced accused. See United States v Moreno, 10 USCMA 406, 27 CMR 480. As to that housebreaking and larceny the prosecution's case was clear and unequivocal. The evidence showed that accused was caught red-handed as he emerged from the exchange with the stolen articles. Faced with this situation accused initially admitted his presence in the building but claimed his actions had been coerced at gunpoint. When this unlikely story failed to satisfy the agents, accused admitted its falsity and orally confessed, which confession he made again in writing the next day.

Against this strong showing, the accused initially asserted only that he had been drinking and couldn't remember events that took place during the critical period. Notwithstanding that this position failed to meet the Government's evidence head-on, even if it was effectively abandoned by accused before he left the witness stand, for he literally destroyed himself from his own lips. Thus, when accused's testimony, both on direct and on cross-examination—quoted hereinbefore—is considered, no real question was left as to his guilt. When all was said and

done, even under accused's own story as a witness, he admitted his presence in the exchange; conceded he at first lied about Guamanians in an attempt to explain his actions; twice mentioned "what had been done," and his need for an excuse; and when inquiry was made on cross-examination as to "what had been done," acknowledged that the authorities were not mistaken in accusing him of the offenses. Even appellate defense counsel candidly state in their brief on the certified issue, that accused's testimony "constitute[d] a direct admission of guilt."

We need not decide whether this characterization of accused's testimony is precisely correct, nor need we closely scrutinize the board of review's conclusion that accused judicially confessed his guilt of these two crimes. Suffice it to state, as did a unanimous Court in United States v Moreno, supra, 10 USCMA at pages 409 and 410, that with a record in this posture, "there was no fair risk of material prejudice to the accused," and "error without resulting prejudice does not warrant reversal."

The theft of the wrist watch and associated housebreaking, however, are another matter. The prosecution's case as to them lacks the same compelling quality, and accused's testimony as a witness did not touch on those two crimes. Concerning them, there is some risk that the deliberations of the court-martial were improperly affected by the evidence of accused's theft from the little girl and of stealing the two articles of women's clothing, for which no charges were preferred. United States v Robertson, supra, and allied cases.

For the above-stated reasons, the findings of guilty of larceny of the watch and of the housebreaking during which that theft occurred cannot be approved. To that extent, therefore, the decision of the board of review is reversed. The record is returned to The Judge Advocate General for further action not inconsistent with this opinion. A rehearing may be ordered on the pre-Christmas offenses and the penalty, or a board of review may reassess accused's sentence on the basis of the two valid findings of guilty.

Chief Judge QUINN and Judge FERGUSON concur.