UNITED STATES, Appellee

v

EDWARD F. YANUSKI, Staff Sergeant,
U. S. Air Force, Appellant

16 USCMA 170, 36 CMR 326

No. 19,066

March 25, 1966

 

*Lieutenant Colonel Milton E. Kosa* argued the cause for Appellant, Accused. With him on the brief was *Colonel Joseph Buchta.*

*Lieutenant Colonel Robert M. Haynes* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

### Opinion of the Court

KILDAY, Judge:

Appellant was arraigned before a general court-martial convened at Malmstrom Air Force Base, Montana, charged with taking indecent liberties with a female under the age of sixteen, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934, and attempted carnal knowledge of the same individual, in violation of Article 80, Uniform Code of Military Justice, 10 USC § 880. He pleaded not guilty to both charges. He was found not guilty of the indecent liberties charge but guilty of attempted carnal knowledge. He was sentenced to a bad-conduct discharge, confinement at hard labor for one year, and reduction to the grade of airman basic. The convening authority approved the sentence. A board of review in the office of The Judge Advocate General of the Air Force affirmed the findings of guilty and the sentence. By direction of the Secretary of the Air Force, appellant was transferred to a retraining group.

This Court granted review to consider two issues which will be hereafter stated.

At the time of trial, appellant was a staff sergeant. He is fifty-one years of age, and has over nineteen years of service, including combat duty in World War II and service in Korea during that conflict. He has no prior record of civilian or court-martial convictions, no punishment under Article 15, Uniform Code of Military Justice, 10 USC § 815, and he was rated as "An Excellent Airman." Appellant is a watchmaker by profession and his duties in the Air Force have been in that connection and in instrument maintenance. The nature of his specialty and consequent duties may have militated against him to some extent, as the staff judge advocate saw fit to include in his post-trial review the statement, "Sgt. Yanuski strikes one by his appearance and attitudes as more of a watch maker than a noncommissioned officer in the Air Force." The fact that appellant's wife, during the pendency of these charges and for reasons foreign to them, instituted suit for divorce found its way into the record of trial; and the staff judge advocate saw fit to include in the post-trial review the statement, referring to appellant, "He had no record of

**171**

former disciplinary action prior to the events which led to this trial, and he disclaimed any civilian convictions. He has, however, experienced increasingly turbulent domestic difficulties." These domestic difficulties and the irritation they had been to appellant's commander were before the convening authority, in the clemency report of his squadron commander who stated, "SSgt Yanuski's attitude and behavior during his service in CAMS has not always been up to Air Force standards. He has had frequent marital difficulties often involuing [sic] the undersigned. The CAMS First Sergeant and Air Police. His marital difficulties are further complicated by a drinking habit. In his home life as in his duty performance he displays a marked lack of self-control particularly with minor children." Much of this seems contrary to appellant's rating as "excellent airman."

The prosecution presented but two witnesses, the child who detailed the alleged misconduct and an Office of Special Investigations agent who testified that, in three interviews, appellant steadfastly denied the allegations.

Charges in this case were preferred more than eighty days after the alleged offense. The delay is unexplained. The Article 32 hearing was begun five months after charges were preferred. This delay is properly accounted for, primarily because of a requested psychiatric examination of appellant and two serious surgical operations performed upon him. The trial began more than nine months after the date of the alleged offense.

At the trial the child witness testified she was then nine and one-half years old. As to the offense, she testified that, in early July 1964, she went to the home of appellant to play with his daughter. The appellant agreed to play hide-and-seek with the girls. Appellant is alleged to have told them he would be "it" and that one of the girls was to hide upstairs and the other downstairs. She testified that they hid only one time. According to the child, she went downstairs and hid in the bathroom. She was followed by appellant who proceeded to seat her up on a clothes dryer, remove her pants, and try to place his penis in her. She testified he quit because it hurt her and his penis wouldn't fit. She made no resistance because she was scared. Then she said appellant took her into another room and, in her presence, engaged in an act of masturbation. Appellant's daughter then came downstairs and the child witness told her she had to go home. She left but did not tell her mother about the alleged incident until four or five days later because she was afraid her father would get mad. The day following the incident, however, she went with appellant and his daughter to a picnic.

The only other prosecution witness was the Office of Special Investigations agent who testified that he interviewed the appellant on three occasions at which times the appellant denied the allegation but stated that "while his wife was away . . . he played hide and seek in his quarters with his daughter" and the child witness on about the dates claimed by such witness.

Appellant's wife appeared as a witness in his behalf. She testified that the alleged victim's mother had telephoned her concerning the alleged offense, and she immediately went to the home of the child to discuss the matter, at which time the parents discussed sending the child to a civilian doctor for an examination. An appointment with the doctor was made, but the child refused to go to him. Thereafter, the child's father came to the home of the appellant and announced he was taking the child to the Air Force base. An examination of the child by the service physician proved to be negative. Appellant's wife also testified that the alleged victim had frequently played with her daughter at her home and had spent several nights there, the last being on the date of the offense. She also testified that on the day before the alleged offense she had told the alleged victim she could not again eat at her home because upon returning home from work she had found her house "in a mess." The day after telling the

child this, the child sent a note to the witness reading, substantially, " 'I know you don't like me so I am not coming to your house any more.' " Notwithstanding, the child spent that night at the witness' home and on the following day appellant, in the company of the two children, drove the witness to work and then appellant took the two children to a picnic at the base. On this occasion the alleged victim did not "evidence any emotion . . . toward" appellant. Appellant's wife testified that she had commenced action for divorce against appellant, for reasons not connected with the alleged offense, but she then hoped the marriage would continue.

The appellant's sixteen-year-old stepson appeared as a witness in appellant's behalf, and testified that the alleged victim had made a statement to him at about Christmas time, prior to the trial—hence about six months after the alleged offense—that "the only reason she was doing this [was] because my mom wouldn't let her eat at our house any more," referring to the accusation of the child against the appellant. Trial counsel was then permitted, over defense objection, to adduce in open court an admission by the stepson that he had been "convicted" by a juvenile court in Minnesota and given a year's probation for breaking and entering. The law officer, in an out-of-court hearing that preceded the impeachment testimony, had deferred ruling on the defense objection to the impeachment matter, but after the testimony was received in open court overruled the defense objection and instructed the court:

". . . [T]he testimony relative to the conviction has been admitted solely as bearing on the credibility of this witness and for no other purpose."

Appellant's daughter was called as a witness for the defense. She testified that one day in the previous summer she had played hide-and-seek with her father and the alleged victim. They had hid three or four times, but separately only once. The alleged victim had made no complaint that day and after playing hide-and-seek they watched television and then went outside to play. The witness was in the house during the hide-and-seek game, could hear what was going on, and never heard "anything bad or any noises." The longest the alleged victim was not with her during the hide-and-seek game was a minute or two. The alleged victim never reported anything to her until about one or two weeks later. Appellant's daughter also testified to delivery of the note from the alleged victim to her mother. Her father never suggested that she hide upstairs and the alleged victim downstairs. The daughter also testified she and the alleged victim are no longer friends because the other child "kept getting mad" at her, "and would lie."

After all the evidence for both the Government and the accused was in, and after holding out-of-court hearings on the instructions, the law officer *sua sponte* instructed the court members:

"Gentlemen of the court, at this time the law officer, having had second thoughts on one of its rulings, has reversed its ruling, and at this time I will give you that ruling. The testimony of Ralph Johnson relative to misconduct and a conviction is determined to be inadmissible and the court is instructed to disregard it in its total. Is [sic] there any questions on the instruction? Now you remember the reason it was permitted in. Now the ruling is reversed; it is to be disregarded in toto, and I will ask each of you individually if you feel you can disregard this."

Each member responded in the affirmative. Individual civilian counsel, however, moved for a mistrial, arguing that the law officer's instructions to disregard were insufficient to cure the prejudice resulting from the improper impeachment of the stepson. The motion was denied. We note this last instruction was delivered some four hours after the receipt in evidence of the impeaching testimony,

**173**

and immediately prior to argument on findings.

## I

The first issue upon which this Court granted review poses the question:

"Whether under the circumstances of this case the court members could be reasonably expected to disregard the improper impeachment of the defense witness, Ralph Johnson (R. 122, et seq)."

The Government contends that the cross-examination of appellant's step-son as to his conviction by a juvenile court was permissible, therefore not error, and that appellant received a gratuity from the instruction of the law officer to disregard the same. We proceed to a determination as to the permissibility of such cross-examination.

In United States v Roark, 8 USCMA 279, 24 CMR 89, this Court had before it a case in which the accused was required to reveal that he had been confined by a juvenile court because of having committed offenses involving moral turpitude. This was held to have been error as to an accused. In reaching that conclusion, however, we discussed the considerations of public policy which sustain the rule of exclusion and cited, with approval, holdings as to the cross-examination of witnesses as well as the accused. We there said:

". . . The guiding social policy of the juvenile delinquency statutes which exist in better than half of the jurisdictions in this country is to reform the juvenile offender's wayward propensities rather than to punish him. If the rehabilitation process is successful, a fresh start for the minor is envisioned. To achieve this end, provisions have been incorporated in practically all such statutes that records of adjudications or convictions dealing with the disposition of a child are inadmissible in other cases. Other States hold that oral evidence to prove the adjudication or any evidence taken in the proceeding will not be admissible thereafter in the proceedings of other courts. The clear design in laying down those rules of exclusion is that the indiscretions of youth will not be used to brand him in later life, as happens in the case of adult recidivists." [United States v Roark, supra, at page 282.]

In Roark, supra, we quoted with approval from Thomas v United States, 121 F2d 905 (CA DC Cir) (1941). There, at pages 907–908, appears the following:

"On cross-examination at the original trial, the complaining witness was asked by appellant whether she 'had been arrested and tried for larceny in the Juvenile Court on or about July, 1939.' The court, upon objection of the government, refused to allow the question. This—contrary to appellant's contention—was eminently correct. . . .

". . . Its [the juvenile court's] procedure in making that adjudication is non-criminal in character. Consequently, such an adjudication of the Juvenile Court concerning a child—whether he may be voluntarily delinquent or merely the unfortunate victim of others—is in no sense the counterpart of a conviction in a criminal court; and none of the implications of conviction should result therefrom."

Chief Judge Quinn concurred in Roark, supra, but gave as his reason the following:

". . . The proceedings as to which trial counsel persistently attempted to cross-examine the accused were held in a civilian jurisdiction. Necessarily the nature of those proceedings is determined by the law of that jurisdiction. Here, the law of that jurisdiction provides that the early proceedings against the accused did not constitute a conviction for crime. Consequently, they do not meet the requirements of the Manual, and cannot be used for impeachment purposes."

174

We note that the law of Minnesota provides that the juvenile court's disposition of a child under its act shall not "be lawful or proper evidence against such child for any purpose" except under this act. See Wigmore, Evidence, 3d ed, § 196, at page 674.

See United States v Shaughnessy, 8 USCMA 416, 24 CMR 226; United States v Cary, 9 USCMA 348, 26 CMR 128; United States v Liscar, 11 USCMA 708, 29 CMR 524; United States v Butler, 13 USCMA 260, 32 CMR 260. Also see, generally, United States v Moreno, 10 USCMA 406, 27 CMR 480; United States v Robertson, 14 USCMA 328, 34 CMR 108; United States v Kindler, 14 USCMA 394, 34 CMR 174.

In its opinion in the instant case the board of review stated:

". . . In the case at bar, however, the evidence of juvenile court involvement arose during cross-examination of a 16-year-old witness testifying on behalf of the accused. In our opinion, there is considerable merit in the view held by many courts that a person under the age of 18 does not have mature judgment and may not fully realize the nature or consequences of his act, and that a youthful indiscretion should not carry the haunting stigma of a criminal conviction (see United States v Fotto, 103 F Supp 430 (SC NY 1952); State v Guerrero, supra; Thomas v United States, 121 F 2d 905 (DC Cir 1941); People v Smallwood, 306 Mich 49, 10 NW2d 303). Accordingly, we adopt what we consider the better view and hold that such evidence is inadmissible."

We agree with the reasoning and conclusion of the board of review as above-quoted and hold it ▮▮▮▮▮ was error for the law officer to permit the cross-examination of appellant's stepson as to his conviction by the juvenile court. The board of review held, however, that such testimony did not prejudice the appellant. We shall deal with that subject later, but feel at this point we should advert to another matter mentioned by the board of review in this case and also referred to by this Court in its opinion in United States v Roark, supra. This has to do with the following comment by Professor Wigmore in his treatise on evidence:

"A judgment, finding, or proceeding of delinquency in a *juvenile court* is by modern statutes forbidden to be used 'against the child' in any other court (*ante*, § 196). It would be a blunder of policy to construe these statutes as forbidding the use of such proceedings to affect the credibility of a juvenile when appearing as witness in another court. A typical delinquent is a girl of corruptive environment or nymphomaniac tendency; such a girl is often the cause of injustice to an innocent man by making false charges of rape or indecent liberties; (*ante*, § 924a); and the revelations in the juvenile court may be the best or even the only means of exposing the testimonial untrustworthiness of the witness. Neither the policy nor the wording of the statute (liberally construed) should forbid such use." [Wigmore, Evidence, 3d ed, § 980 (7).]

John Henry Wigmore, Professor of Evidence, Northwestern University, and his treatise on evidence, have had a salutary effect upon military jurisprudence. The Articles of War were amended by the Act of August 29, 1916. 39 Stat 650. These amendments contained Article of War 38, the equivalent of the present Article 36, Uniform Code of Military Justice, 10 USC § 836, authorizing the President to prescribe the procedure, including modes of proof, in cases before courts-martial. The Manual for Courts-Martial, U. S. Army, 1917, contained a chapter on evidence and, in the introduction, said, with reference thereto, "Prof. Wigmore has given liberally of his time in the preparation of this chapter, has lent the authority of his name to what appears therein, and has performed a work of great value for which appreciation will be general throughout the service." A similar acknowledgment is contained

in the introduction to the Manual for Courts-Martial, U. S. Army, 1921. Though not attributed to Professor Wigmore, the Manual of 1917, at page 252, contains:

"It has been said of this offense that 'it is true that rape is a most detestable crime * * * ; but it must be remembered that it is an accusation easy to be made, hard to be proved, but harder to be defended by the party accused, though innocent.' "

The same language appears in paragraph 442 of the Manual of 1921, and is carried into paragraph 199a of the current Manual of 1951. We can only surmise the extent the influence of Professor Wigmore may have had upon the inclusion in the Manual for Courts-Martial, United States, 1951, of provisions with reference to sex offenses including paragraph 142c on fresh complaint; paragraph 153a on uncorroborated testimony of an alleged victim in a trial for a sexual offense; paragraph 153b on cross-examination of the victim in a rape case, and the further statement in that provision that "For the purpose of impeaching the credibility of the alleged victim, evidence that the victim has an unchaste character is admissible, under the above conditions, in a prosecution for any sexual offense, such as carnal knowledge, even though consent is not an element of the offense"; paragraph 199a on the consideration of all the surrounding circumstances in determining whether a woman gave her consent, or whether she failed or ceased to resist; and paragraph 200b on carnal knowledge.

In any event it appears that the apprehensions expressed by Professor Wigmore in § 980(7), above-quoted, have been eliminated in military trials. The paragraphs of the Manual above mentioned have the force of law. United States v Smith, 13 USCMA 105, 32 CMR 105. See, also, United States v Goodman, 13 USCMA 663, 33 CMR 195.

There may be other provisions of the Manual which provide exceptions to otherwise general rules of evidence.

In this case we decide no more than that, in the absence of some special consideration or the intervention of some Manual or otherwise binding rule, it is error to elicit that a witness, as well as an accused, has been proceeded against in the juvenile court; and that the admission of such evidence, if the same materially prejudices the substantial rights of the accused, is cause for reversal. Article 59, Uniform Code of Military Justice, 10 USC § 859.

II

While holding the admission of evidence in impeachment of appellant's stepson to be error, the board of review determined the same did not prejudice appellant and affirmed his conviction.

Immediately prior to argument on findings, the law officer instructed the court-martial he had reversed his decision, and that evidence appellant's stepson had been convicted by a juvenile court should be disregarded *in toto*. Ordinarily an error in admitting evidence can be cured by striking it and instructing the court members to disregard the same. United States v Patrick, 8 USCMA 212, 24 CMR 22; United States v Hurt, 9 USCMA 735, 27 CMR 3; United States v. O'Briski, 2 USCMA 361, 8 CMR 161; United States v Shaughnessy, 8 USCMA 416, 24 CMR 226. This, however, is not inevitably true.

In United States v Britt, 10 USCMA 557, 28 CMR 123, we recognized the rule that an instruction by the law officer to disregard an attempted impeachment is generally sufficient to eliminate the possibility of harm to the accused. We then added, "But each case must be considered on its own facts." In United States v Krokroskia, 13 USCMA 371, 32 CMR 371, we observed, "Whether an instruction to disregard improper evidence is sufficient to eliminate prejudice depends upon the circumstances of the particular case." We must determine whether, notwithstanding the instruction not to consider the evidence of impeachment, there is a fair risk that

its admission influenced the court members. United States v Britt, supra; United States v Miller, 14 USCMA 412, 34 CMR 192; United States v Shipman, 9 USCMA 665, 26 CMR 445; United States v Shepherd, 9 USCMA 90, 25 CMR 352; United States v Warren, 6 USCMA 419, 20 CMR 135. This is particularly true where the evidence of guilt is not compelling. United States v Krokroskia, supra; United States v Gibson, 5 USCMA 699, 18 CMR 323; United States v Miller, supra.

We agree with the board of review that the critical issue in this case was the credibility of the alleged child victim. The evidence is not compelling. It depends entirely upon the statements of the alleged victim and there are discrepancies between her testimony at the Article 32 hearing and at the trial. Her testimony indicates that she is precocious and, as to sex, sophisticated beyond her tender years. She did not tell her mother of the incident for days after the alleged occurrence. Neither of her parents appeared as a witness, so we are in the dark as to the reasons and circumstances under which she finally disclosed the claimed violation. She accompanied appellant and his daughter to a picnic shortly after the alleged incident. That the child was capable of retaliation must be conceded because of the undenied delivery of the note to appellant's wife stating she would not again visit her home because of some actual or fancied grievance. The testimony of the stepson placed the charges in the same character of retaliation. In short, the evidence does not make clear whether there was a wrong, a fantasy, or an effort to retaliate. It is significant that the child refused to go to the doctor for an examination until later compelled by her father, and the examination was negative.

The testimony of the stepson was vital to appellant's case; and the effect of the impeaching testimony was to destroy it. This it did quite effectively.

We cannot overlook the fact that some four hours intervened between the production of the impeachment and the instruction not to consider it. Equally harmful was the calling of the evidence to the attention of the court-martial immediately before arguments—the very time when analysis would take place. That trial counsel believed the impeachment to be devastating is evidenced by his insistence upon its admission in the face of timely and strenuous objection.

Under the circumstances of this case, we believe that, notwithstanding the law officer's instruction to disregard, there is a fair risk the admission of the impeachment evidence was materially prejudicial to the substantial rights of the accused. The timely objection to it should have been sustained and the motion for mistrial should have been granted.

III

The second issue specified for consideration inquires whether it was correct to refer to the statements of appellant denying guilt as being "admissions" in regard to being present in his home and playing a game with the children at or about the time of the alleged offense. In view of our action in reversing the conviction on another ground, this assignment need not delay us.

The record reveals that the agent to whom appellant gave an out-of-court statement, without objection, used the word "admit," "admitted," or "admission." In an out-of-court hearing those words were used on several occasions. In open court but scant reference was made to "admissions."

Paragraph 140a, Manual for Courts-Martial, United States, 1951, states:

"A confession is an acknowledgment of guilt, whereas an admission is a self-incriminatory statement falling short of an acknowledgment of guilt."

When it is necessary to prove the

presence of an accused at the time and place of an alleged of- ██ fense, we take it a statement by the accused that he was so present at that time and place may be properly denominated as an "admission." Jones, The Law of Evidence, 5th ed, section 398. While we have no doubt that the distinction between a "confession" or an "admission" might be of importance in a proper case, we fail to perceive any fair risk of prejudice to the appellant in the use of the word "admission" within the context of this record.

The decision of the board of review is reversed. The record will be returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge QUINN and Judge FERGUSON concur.