UNITED STATES, Appellee

v

ADRIAN E. RUSSELL, Sergeant First Class,
U. S. Army, Appellant

15 USCMA 76, 35 CMR 48

No. 17,509

October 16, 1964

*Captain Beverly B. Bates* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk* and *Captain Daniel H. Benson.*

*Captain Charles M. Pallesen, Jr.,* argued the cause for Appellee, United States. With him on the brief were *Colon⌐ ⌐ruce B. Babbitt* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

KILDAY, Judge:

The accused was convicted by general court-martial of carnally knowing a female under the age of sixteen years and sentenced to a bad-conduct discharge, total forfeitures, one year of confinement at hard labor, and reduction to E–1. The findings and sentence were approved by intermediate authorities and we granted accused's petition for review to consider several assignments of error. In order to place these

issues in proper perspective, a brief recitation of the evidence which formed the basis for our grant is in order.

The appellant, who had been on temporary duty in Greenland, returned home at 4:00 a.m. on the day in question. At that time, the victim and her two younger brothers, who were being cared for by appellant's wife while their mother worked to supplement her income, were also present. Upon retiring appellant and his wife had sexual relations. Later that afternoon, the victim's mother picked up her children and took them shopping. She returned and again left the children at about 6:00 p.m. and returned to work. While she had the children she stopped at her residence and the victim, who was wearing pajamas, changed into street clothes, including the panties and slacks which formed a part of the testimony about which the case revolved. After the victim's mother left, appellant went to the store to purchase pizza and beer for the evening meal. When he returned without the beer his wife decided to go for it herself, leaving appellant, his two young sons, the victim and her two brothers in the apartment.

During her absence, according to the victim, the following occurred: Initially all five children and the accused were doing acrobatic tricks in the kitchen. At one point the victim noticed that the fly of appellant's trousers was unzipped and began teasing him about it. Then the phone rang and when appellant went to answer it the victim joined the other children in the living room and watched television. After the phone call, the victim testified, the appellant called her to the kitchen, pulled her slacks and underpants down to her knees, and unzipped his zipper. He thereupon assumed a knee bend position, placed his hands upon her buttocks and "stuck his thing into mine." Because it hurt she slapped him but made no outcry. When she pulled up her clothes she noticed a white sticky substance on the underpants. This turned green by the next morning.

The appellant's wife returned about ten minutes after her departure for the

beer and a normal evening passed. Upon awakening, the appellant and his wife again performed the conjugal act. During that day, the appellant, according to the victim, took all five children for a walk and then drove them to the victim's residence so she could dispose of her goldfish which she had purchased the previous day while shopping with her mother. No one was there. She made a telephone call and spoke to the mother of her best friend. She was in the house about fifty-five or sixty minutes. She left after appellant honked his horn and sent his son in to get her. They all returned to appellant's home and the victim and her brothers were taken to their apartment at about 4:00 p.m. by a Sergeant W. and his wife and child. At about 9:00 p.m., while retiring, the victim told her mother about the alleged incident.

A Federal Bureau of Investigation agent who conducted a laboratory examination of the victim's clothing testified that he found traces of semen in the crotch of the underpants and the slacks. Upon analysis he determined that this semen did not contain any of the affirmative blood characteristics (A, B or AB) and concluded that the semen was produced by a person having O (negative) type blood or by one of the affirmative types who does not secrete these characteristics in their other body fluids. Statistically, he stated, 45% of the population has been found to have O type blood and 40% to have A type, the remainder being divided between B and AB, the latter being a combination of the two. Of those persons having one or a combination of the affirmative characteristics, 85% are secretors.

In argument before the court, trial counsel stated:

"Now there is one other thing that bears your consideration. With respect to blood types, do you recall the testimony of Special Agent Bidez that the semen on both of the samples of the victim's clothing which had semen was that of a person who was either of Type O blood or who was a non-secretor? Now you have heard the testimony. You have heard the

stipulation which states that Sergeant Russell has Type A blood. Now you recall again Specialist Agent Bidez's testimony to the fact that 85 percent of the people having Type A blood would be non-secretors.[1] This means that if he was completely innocent, the accused has an ordinary probability that 85 out of 100 times he would be categorically excluded from this group. He testified on the stand. He appeared before you. He protested his innocence, yet you have never heard anything from him despite these long recitations, no crimes, nothing else, you have never heard any recitation on his part that he ever submitted to a blood test of any type. Of course, you never heard any testimony of any type as to whether he was asked to. I ask the court to bear in mind that I am not misleading you but this is what I say, that he had the possibility of being categorically excluded and that the odds were in his favor. At the present time there is no conclusive tie but there is nothing either way. We do not mean to imply in any way that the defense has any obligation. The obligations are always on the prosecution."

We have quoted the above portion of trial counsel's argument in full since it forms the basis for a substantial part of our grant on appellant's petition to consider:

Whether the law officer erred in admitting evidence of the blood type of the semen on the victim's panties and slacks.

Whether the law officer erred in permitting trial counsel to argue that this evidence of blood type established that the accused could have been the assailant.

Whether it was prejudicial for trial counsel to argue there was no recitation by the accused "that he [had] ever submitted to a blood test of any type."

Inasmuch as these issues all deal in substance with the same subject matter, we will consider them together.

Initially the Government argues that failure of defense counsel at trial to object to the admission of the evidence of blood types constitutes waiver and that defense has no standing to urge the matter for the first time on appeal. Notwithstanding it argues, citing this Court's opinion in United States v Hurt, 9 USCMA 735, 27 CMR 3, that the evidence was admissible as relevant expert testimony and although possibly of little probative value the weight to be given thereto is for the court-martial to determine. In addition, the Government points to trial defense counsel's argument on this precise issue and asserts that the "obvious import of this argument is that the defense felt that the medical testimony actually helped the appellant."

With reference to trial counsel's argument, as noted above, the Government asserts that "Where an accused voluntarily testifies to material facts concerning his guilt or innocence, any *failure* on his part to deny or explain incriminating facts already in evidence may be commented upon by the prosecution. . . . By such testimony the accused subjects his silence to inferences that are naturally drawn therefrom and the prosecution has the right to comment on these inferences."

The appellant does not reply directly to the Government's contention of waiver by failure to object at trial, stating only that the evidence of the blood type of the semen was inadmissible and the law officer erred in admitting it, even though no objection was raised by defense counsel.

In support of his position, the appellant points to a long line of paternity suits where the evidence of blood groups is admissible only to show nonpaternity and is not admissible to establish that the defendant may be the father.[2] As to the admission of evidence similar to that in the case at bar, appellant has discovered only one decision, People v

[1] Patently, trial counsel meant that 85% of this group would secrete.

[2] See Annotation, 46 ALR2d 1000, 1019.

Kemp,[3] wherein the competency of the evidence apparently was assumed and not in issue. In view of the lack of authority in this area, appellant recommends a circumspect attitude toward the competency of the evidence herein admitted, especially where other body fluids are being tested as opposed to a test of blood where the similarity or dissimilarity of types can be conclusively established.

The argument of trial counsel that Russell had failed to submit to a blood test of any type is viewed by the appellant as a direct attack on accused's right under the Fifth Amendment and Article 31 of the Code to refrain from helping the Government prove its case. The appellant finds a crucial difference between the testimonial waiver effected as a result of an accused taking the stand and the residuum of constitutional guarantee never waived.

At the outset it is incumbent upon us to consider the competency of the admitted testimony of the semen analysis and its results. Only if the testimony was competent does the issue of waiver present itself.

In People v Kemp, supra, competency was apparently assumed. There, the appellant's blood and his saliva (another of the body fluids in which affirmative blood factors are secreted) were tested and compared with a similar test of the semen extracted from the vagina of the victim. The experts testified that the seminal fluid was of a type that could have been that of appellant. As the court stated, "This, like the usual blood test, is an exclusionary test—it does not positively identify the person, but it may exclude the person suspected. The test showed that appellant could not be excluded."

Like appellant, we were unable to find additional cases in point.[4] In view of the lack of authority thereon we are urged to exercise a circumspect attitude toward the competency of this evidence and to consider the rule as to blood groups generally in paternity cases as controlling; that is, that evidence as to blood groups is admissible only to exclude the possibility of paternity and not admissible to establish that a particular person may be the father. Annotation, 46 ALR2d 1000, 1019. But these holdings are, for the most part, based on a specific statute and while the testimony is viewed as controlling as to nonpaternity, the holdings apply to such specific cases alone. In those instances in which blood grouping test results are employed outside of paternity cases to prove identity, they are not of conclusive weight but are merely to be considered together with other pertinent evidence. See Annotation, 46 ALR2d 1000, 1005.

In Commonwealth v Statti, 166 Pa Super 577, 73 A2d 688 (1950), a prosecution for rape, blood from the jacket of the victim was tested and found to be type O, the same as the defendant. The victim was type A. The court stated:

" . . . Evidence of the results of these tests . . . was properly admitted as a circumstance bearing on the identification of the defendant, in corroboration of the testimony of the prosecuting witness that he was her assailant. . . . And the admissibility of this evidence is not affected by the fact that Type O blood is common to perhaps 45% of the people of the world. It was still competent as some evidence, . . . though by no means conclusive of identity. The jury were carefully instructed as to the significance of this testimony."

[3] People v Kemp, 55 Cal 2d 458, 11 Cal Rptr 361, 359 P2d 913 (1961), cert den 368 US 932, 7 L ed 2d 194, 82 S Ct 359.

[4] We can only speculate that a possible reason for a paucity of cases on this issue is the fact that such tests deal directly with the use of other body fluids, in addition to blood, and obtaining such samples, where an accused objects, may be extremely difficult without violating his constitutional privileges; United States Constitution, Amendment IV; or in such a manner as to be considered as cruel and inhuman within the meaning of Rochin v California, 342 US 165, 96 L ed 183, 72 S Ct 205 (1952).

In the case at bar, the test of the semen was made for the purpose of establishing identity. While the percentage of possibility was rather low, the weight to be given to this testimony was for the court-martial to determine. The evidence itself was admissible. United States v Hurt, supra; Commonwealth v Statti, supra.

Apparently all parties at the trial assumed the admissibility of the evidence; defense counsel stipulated that the appellant had type A blood and both trial and defense counsel argued this issue before the court, although for different reasons. Defense counsel asserted that the percentages reflected "over 50 percent of Americans falling in the category that could be the blood and the sperm found on the panties." Trial counsel, however, utilized these same percentages to cast doubt on the appellant's claim of innocence by stating that while the appellant had an ordinary probability that 85 out of 100 times he would be categorically excluded "if he was completely innocent," at no time had "he ever submitted to a blood test of any type."

The issue of establishing the identity of the appellant through analysis of the semen was admittedly rather slight. However, it was a circumstance to be considered by the court in corroboration of the victim's testimony. Even had it been shown that the appellant was a secretor, this would not have been conclusive of his guilt but only a stronger circumstance to consider along with all of the other evidence. Commonwealth v Statti, supra, footnote 5. As an issue, it was proper matter for argument before the court.

Trial counsel, however, went too far in his efforts to convince the court of the guilt of the appellant, when he called attention to the fact that the accused had not taken advantage of such favorable odds by submitting to a blood test.[5] True it is that the appellant might have been able to exclude himself from the ambit of the expert testimony by producing proof that he was a secretor. However, in the event that he was one of that negligible minority of nonsecretors, he would, even though innocent, be unable to produce exculpatory proof to place alongside his denial of guilt. The unmistakable import of the prosecutor's statement is that the appellant's failure to thus clear himself "if he was completely innocent" should be considered against him. United States v Skees, 10 USCMA 285, 27 CMR 359; cf. Wilson v United States, 149 US 60, 37 L ed 650, 13 S Ct 765 (1893). It is, in effect, a comment on his failure to testify and although he took the stand and denied his guilt, he is not thereby completely shorn of his pre-existing constitutional right against self-incrimination. He is under no obligation to aid the Government in obtaining his conviction. Cf. United States v Onassis, 125 F Supp 190, 209 (1954). More fundamental to the issue at hand is the basic right of an accused not to speak at all, and the fact that refusal to do so at an earlier time may not be paraded before the court by way of cross-examination. United States v Brooks, 12 USCMA 423, 31 CMR 9; United States v Grunewald, 353 US 391, 1 L ed 2d 931, 77 S Ct 963 (1957); Stewart v United States, 366 US 1, 6 L ed 2d 84, 81 S Ct 941 (1961). To do so by way of argument before the court is likewise error. United States v Skees, Wilson v United States, both supra. Cf. United States v Seay, 13 USCMA 540, 33 CMR 72, and cases therein cited.

In the matter of prejudice, we note the law officer did not instruct the court-martial that no adverse inference should be drawn against the appellant for his failure to submit to a blood test. Such an instruction might serve to eliminate any prejudice therefrom. United States v Di Carlo, 64 F2d 15 (CA 2d Cir) (1933). But he was not asked to and can it be said that failure

---

[5] We take this view notwithstanding trial counsel's disclaimer that appellant had an obligation to do so; that the ob- ligations (of proof) are always on the Government.

to request such an instruction constitutes waiver?

In Grunewald v United States, supra, the Court held that cross-examination of the defendant on his previous reliance upon his constitutional privilege to remain silent when interrogated before the grand jury was impermissible and prejudicial despite an instruction to the jury that no inference of defendant's guilt could be drawn from his prior reliance upon the Fifth Amendment. And in Stewart v United States, supra, where a motion for mistrial was denied and no instruction given or requested, the Court held that reversal was necessitated by the probable effect of the point upon the jury.

While impermissible comment by the trial counsel should ordinarily be objected to by the defense ██ (United States v Sims, 5 ██ USCMA 115, 17 CMR 115; United States v Skees, supra), failure to object does not deprive the appellant of the right to appellate review of the error if application of the rule of waiver results in a miscarriage of justice. United States v Skees, supra.

In view of the nature of the error, involving as it does the critical area of self-incrimination, it would be a miscarriage of justice to disregard the error on the ground of waiver. United States v Skees, Grunewald v United States, Stewart v United States, Wilson v United States, all supra; cf. United States v King, 12 USCMA 71, 30 CMR 71.

Having determined that prejudicial error was committed, necessitating reversal and a rehearing, we will comment only briefly on the other granted issues.

During the presentation of the Government's case, trial counsel elicited testimony that the accused had been drinking, in his home with friends, on the afternoon of the day in question; during this period of time he made an off-color remark while in the presence of an adult female visitor. Trial counsel's argument, in answer to defense objection on the grounds of irrelevancy, was that "it is the common knowledge of mankind that alcohol has the effect of lessening one's inhibitions" and that the off-color remark indicated "the accused's mind was becoming oriented and was acquiring pubic orientation."

The law officer sustained the defense counsel's objection to testimony as to the off-color remark and instructed the court that inasmuch as it was not relevant to the case the testimony should be disregarded.

As we have previouly indicated, such an admonition may or may not be efficacious; each case turns on its own facts. See United States v Keleher, 14 USCMA 125, 33 CMR 337, and cases cited therein. However, since the testimony was declared irrelevant, the issue will not be raised on rehearing and we therefore need not consider its impact in this case.

The law officer overruled defense counsel's objection to testimony as to accused's drinking. Under █ the circumstances of this case we are not prepared to disagree with the law officer's ruling that testimony as to accused's drinking on the afternoon of the day in question was relevant as part of the *res gestae* and admissible for whatever weight the court members might desire to give it.

During his testimony on direct examination the appellant, in response to a question from his counsel, denied committing the offense charged and denied that he had ever molested a girl or chased after young children. On cross-examination, trial counsel, without objection from the defense, elicited from the accused that he had had sexual intercourse with women other than his wife. The appellant considered this as "adultery or something." Trial counsel did not further pursue the matter at that time but on redirect examination the appellant, through questioning by his counsel, stated that he hadn't previously been aware of the meaning of the term adultery; that the women with whom he had had a sexual union prior to his marriage were not themselves married; and that he has not had sexual intercourse with any women other than his wife during their marriage or with his former wife during that relation-

ship. Prior to instructing the court, the law officer informed defense counsel that he proposed to instruct the court that this evidence was admitted only for the purpose of attacking the credibility of the accused and cannot be regarded as affecting the guilt or innocence of the accused for the offense charged. Defense counsel requested that the instruction not be given.

In United States v Robertson, 14 USCMA 328, 34 CMR 108, we held it was prejudicial error requiring reversal for trial counsel, for the purpose of impeachment, to cross-examine an accused about prior acts of misconduct not resulting in conviction of a felony or crime of moral turpitude. In *Robertson*, the law officer instructed in the form proposed in this case not only at the time the evidence was admitted but again following the conclusion of the trial and prior to findings.

In the absence of evidence of a conviction of appellant for extramarital activities, we find trial counsel's inquiry in this area improper and squarely in point with *Robertson*, requiring the same result. Cf. United States v Kindler, 14 USCMA 394, 34 CMR 174, and United States v Miller, 14 USCMA 412, 34 CMR 192.

In sum, then, we hold that trial counsel's argument that the appellant failed to submit to a blood test, and his cross-examination of the appellant as to his sexual activity with women other than his wife, to be prejudicial error requiring reversal.

The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Army. A rehearing may be ordered.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

At the outset it is important to point out that an examination of a pair of trousers obtained from the accused, and admitted into evidence without objection, disclosed the presence of semen on the fly. The amount was too small to test for blood characteristics. Never-

theless, the accused tried to explain its presence. He said that after the first act of copulation with his wife he put on a pair of trousers to go to the bathroom. He admitted he did not ordinarily do so but he did on this occasion because the child occupied the bedroom directly across the hall from the bathroom door. In my opinion, this effort to explain away part of the incriminating evidence emphasizes the failure to counter the other damaging evidence with means that were exclusively within his control.

Of course an accused can refuse to testify and that fact cannot be the subject of adverse comment; nor can an accused be called upon to provide evidence against himself. We are not, however, dealing with the right to remain silent or with the privilege against self-incrimination. What is involved is the right of the prosecution to comment on matters in evidence damaging to the accused which the accused has not refuted or denied in his own testimony upon the merits. Once the accused testifies, he waives the privilege against self-incrimination. From that point on, the prosecuting attorney can legitimately comment on the adverse inferences flowing from the accused's failure to refute or deny matters in evidence. Diggs v United States, 220 Fed 545 (CA 9th Cir) (1915), affirmed 242 US 470, 61 L ed 442, 37 S Ct 192 (1917); United States v Sahadi, 292 F2d 565 (CA 2d Cir) (1961); Dyson v United States, 283 F2d 636 (CA 9th Cir) (1960), cert den 366 US 974, 6 L ed 2d 1264, 81 S Ct 1944 (1961). "It has long been the law," said the Court of Appeals in the *Sahadi* case, "that when an accused voluntarily takes the stand his failure to explain incriminating circumstances is subject to the inferences to be naturally drawn therefrom." *Sahadi*, supra, at page 568.

As I read trial counsel's argument, he was not asking the court-martial to draw an inference adverse to the accused because he had previously been asked to submit to an appropriate test and had refused. In fact, he specifically ruled out that circumstance by calling attention to the fact that there was no "testimony of any type as to whether

he was asked to" submit to a test. All his remarks were addressed directly to the accused's testimony, especially to the significant fact that while the accused vehemently denied the offense, and attempted to overcome the corroborative effect on the child's testimony of the presence of semen on his trousers, by suggesting a way in which the substance might have gotten there, he was silent about the most obvious and direct means, which were peculiarly within his control, to refute the implications of the Government's case. True, the test provided an 85%, rather than 100%, chance of escaping the web of incrimination spun by the Government, but the chance is so substantial that I believe his failure to avail himself of it left him open to trial counsel's argument.

The accused's testimony presented a contradiction. On the one hand, he strongly protested his innocence, and advanced numerous estimates of time and condition to show he could not have committed the act charged; on the other, he said nothing whatever about a circumstance that gave him an 85% factual chance to disprove the victim's testimony. I think the contradiction was a legitimate subject of argument by trial counsel.

I disagree with the conclusion in the principal opinion that evidence of the accused's drinking was admissible as part of the *res gestae* of the offense. However, the case turned specifically and directly on the sharp conflict between the child's testimony and that of the accused; she said he did the act; he said it never happened. In my opinion, the error in the admission of the evidence presents no fair risk of prejudice. I would affirm the decision of the board of review.