UNITED STATES, Appellant

v

DONALD C. KAVULA, Airman Basic,
U. S. Air Force, Appellee

16 USCMA 468, 37 CMR 88

No. 19,673

December 23, 1966

*Lieutenant Colonel Thomas J. Connolly* argued the cause for Appellant, United States. With him on the brief was *Colonel Emanuel Lewis.*

*Lieutenant Colonel Milton E. Kosa* argued the cause for Appellee, Accused. With him on the brief was *Colonel Joseph Buchta.*

## Opinion of the Court

KILDAY, Judge:

Airman Kavula, tried before a general court-martial convened at Westover Air Force Base, Massachusetts, pleaded not guilty to three specifications of stealing mail (Charge I), two specifications of forgery (Charge II), two specifications of larceny and one alleging the wrongful appropriation of a vehicle (Charge III), all in violation of Articles 134, 123, and 121, Uniform Code of Military Justice, 10 USC §§ 934, 923, and 921, respectively.

Exonerated by a finding of not guilty as to Charge I and the three specifications of stealing mail, of specification 3, Charge III, and—by exceptions—of a portion of specification 1 of Charge III, accused was found guilty of all remaining offenses. The court imposed a sentence comprised of a bad-conduct discharge, forfeiture of $75.00 per month for four months, and confinement at hard labor for a like period. Although the convening authority thereafter disapproved the finding of guilty of wrongfully appropriating a vehicle (specification 2, Charge III), he nonetheless approved the sentence as adjudged. An Air Force board of review was then called upon to decide whether or not prosecution was permitted, to Kavula's prejudice, to publish his prior refusal to make a statement and his request for legal counsel, when questioned regarding the wrongful appropriation.

This evidence was purportedly designed to rebut the defense contention that accused lacked the mental capacity to freely exercise his volition to make or not to make pretrial statements concerning other offenses charged. The board of review resolved this question by declaring that

pretrial reliance of an accused upon his Article 31 rights (Uniform Code of Military Justice, 10 USC § 831) was inadmissible in evidence against him. Prejudice was deemed to have run to all counts rather than just the single specification disapproved by the convening authority. They therefore set aside the findings of guilty and the sentence and ordered a rehearing.

In light of the board of review decision, the Judge Advocate General of the Air Force, exercising his right under Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867(b)(2), filed his certificate of review with this Court. He asks:

## I

"WAS THE BOARD OF REVIEW CORRECT IN DETERMINING THAT EVIDENCE OF THE ACCUSED'S ASSERTION OF HIS RIGHT TO REMAIN SILENT WHEN QUESTIONED REGARDING WRONGFUL APPROPRIATION OF A VEHICLE WAS INADMISSIBLE WITH RESPECT TO THE ACCUSED'S MENTAL CONDITION AT THE TIME OF HIS EARLIER STATEMENT CONCERNING THE OTHER OFFENSES CHARGED?"

## II

"IF THE FOREGOING IS ANSWERED IN THE AFFIRMATIVE, WAS THE BOARD OF REVIEW CORRECT IN DETERMINING THAT THE ACCUSED WAS MATERIALLY PREJUDICED BY ADMISSION OF THE EVIDENCE?"

During the development of Government's case, Special Agent Kelly, of the Office of Special Investigations, testified that he had interrogated the accused on December 13 and 16, 1965, and again on January 2, 1966. In each instance the accused was warned of his Article 31 rights, yet each time gave a statement to his interrogators. We are here concerned with the December statements only, for the January document encompassed only an offense of which accused was found not guilty.

In an attempt to suppress prosecution's use of these December pretrial statements, Dr. Chasin was called as a defense witness. This psychiatrist asserted, as he had done on a previous occasion, that, in his opinion, accused suffered from an impaired ability to adhere to the right at the time he gave these statements. He believed that while the accused understood the significance of the Article 31 warning, he was not able to exercise volition in making these statements. In sum, the accused did not possess the ability to make an informed choice.

To counter the effect of the doctor's testimony, prosecution introduced Sergeant Odom, for it was this individual who had taken the accused into custody on December 31st. Sergeant Odom, an air policeman, acting on a stolen automobile report, stopped the accused while the latter was driving a vehicle. Taken to Base police headquarters, accused was there warned of his Article 31 rights and advised of his right to counsel. According to this witness, "He [the accused] stated he didn't want to make a statement, but he requested legal counsel." Immediately thereafter, the Government rested its case.

## I

On the first certified issue, Government relies in large part on those cases that permit, for impeachment purposes, introduction on cross-examination of accused's prior reliance on his rights. This follows testimony in his own behalf where he presents matters inconsistent with an earlier claim of privilege. Raffel v United States, 271 US 494, 70 L ed 1054, 46 S Ct 566 (1926), relied upon by prosecution in this regard, is said not to have been impliedly overruled by United States v Grunewald, 233 F2d 556 (CA2d Cir) (1956), certiorari granted, 353 US 391, 1 L ed 2d 931, 77 S Ct 963 (1957).

Equal emphasis is given Walder v United States, 347 US 62, 98 L ed 503, 74 S Ct 354 (1954), for that court found proper, ordinarily inadmissible evidence to impeach a defendant's testimony. The Supreme Court of the United States affirmed such action in *Walder* on the basis that he had voluntarily made claims which "went beyond a mere denial of complicity in the crimes of which he was charged."

**469**

Thus, Government was entitled to protect itself from "contradiction of his untruths." (Walder v United States, supra, at page 65.)

Be that as it may, the issue is no longer open to argument. This Court has consistently held that pretrial reliance by the accused upon his rights under Code, supra, Article 31, by declining to make a statement, is inadmissible in evidence against him. We so held in United States v Jones, 16 USCMA 22, 36 CMR 178, where that accused invoked Article 31 when asked why he became involved in the theft of a generator; in United States v Andrews, 16 USCMA 20, 36 CMR 176, where testimony was permitted concerning the refusal of that accused to submit to a blood alcohol test; in United States v Russell, 15 USCMA 76, 35 CMR 48, a case where trial counsel called attention to the fact that Russell had not taken advantage of favorable odds by submitting to a blood test; and in United States v Brooks, 12 USCMA 423, 31 CMR 9, where criminal investigators were permitted to relate that Brooks had relied upon Article 31. Error there was compounded by permitting cross-examination of the accused as to the reasons for his silence. See, also, United States v Bayes, 11 USCMA 767, 29 CMR 583, and United States v Armstrong, 4 USCMA 248, 15 CMR 248.

Excluding United States v Shaw, 9 USCMA 267, 26 CMR 47—a case decided by the majority on waiver, a concept not present here—the case most akin factually to that now before us is United States v Kemp, 13 USCMA 89, 32 CMR 89. Both cases focus upon the issue of mental capacity; both contain the testimony of expert witnesses; and, in each instance, it is their utterances that give birth to the revelations under attack. In neither instance did the accused themselves testify.

In Kemp, a defense psychiatrist had agreed that at the time of a purported murder Kemp was in a mental state referred to as "pathological intoxication." Government experts, on the other hand, found no evidence to support this conclusion. Thus, one such Government witness was asked by the defense on cross-examination if it were not so that a psychiatric board had been unable to determine if Kemp was capable of forming the degree of premeditation called for by the offenses charged.

Trial counsel, in turn, asked this same witness why the medical board was unable to make such a determination and was told, "'After the patient's rights were explained to him under the UCMJ, he choose [sic] not to speak about the offense itself at the Board Proceedings.'" (United States v Kemp, supra, at page 97.)

Accordingly, the question there, just as it is in the case at hand, was "whether an accused who has claimed a right guaranteed to him, which springs from the Constitution and is expanded and implemented by statute, may have the fact that he invoked such privilege disclosed against him upon his trial." (United States v Kemp, supra, at page 97.)

We, at that time, said that the unanimous opinion of this Court in United States v Kowert, 7 USCMA 678, 23 CMR 142, appeared to be dispositive of the question. Then held inadmissible was the revelation that Kowert had repeatedly invoked his privilege against self-incrimination when questioned by a superior officer regarding alleged offenses. Thus, the Court said in Kemp:

"... under the facts of this particular case, we are unable to agree with the board of review in its view that questions by defense counsel of Dr. Nathan had opened the door to the prosecution to use accused's reliance upon his constitutional and statutory rights in a manner which effectively converted the shield of constitutional and statutory defense into a sword of offense. Cf. Walder v United States, 347 US 62, 98 L ed 503, 74 S Ct 354 (1954)." (United States v Kemp, supra, at page 98.)

Compare Johnson v United States, 344 F2d 163 (CA DC Cir) (1964), for there, too, the application of Walder

v United States, 347 US 62, 98 L ed 503, 74 S Ct 345 (1954), was rejected. Johnson had taken the witness stand. That court said:

"In the present case, Johnson did not 'of his own accord' exceed the bounds of testimony necessary to his defense by making 'sweeping claims.' He merely offered his own version of the events charged in the indictment." (Johnson v United States, supra, at pages 165–166.)

It was thereafter pointed out in United States v Kemp, supra, that we were being consistent with the Federal rule on self-incrimination as enunciated by the Supreme Court of the United States, citing Slochower v Board of Ed. of N. Y., 350 US 551, 100 L ed 692, 76 S Ct 637 (1956). We further advised:

". . . Article 31 preserves to the accused before a court-martial the full benefits of the Fifth Amendment and extends and enlarges the benefits of that Constitutional safeguard. For a discussion by the Supreme Court of the United States of the nature of the Fifth Amendment and the spirit in which its privilege should be approached, see Ullmann v United States, 350 US 422, 100 L ed 511, 76 S Ct 497 (1956).

"In similar vein, Mr. Justice Harlan stated in Grunewald v United States, 353 US 391, 424, 1 L ed 2d 931, 77 S Ct 963 (1957):

'. . . On the other hand, the danger that the jury made impermissible use of the testimony by implicitly equating the plea of the Fifth Amendment with guilt is, in light of contemporary history, far from negligible. . . .

'We hold that under the circumstances of this case it was prejudicial error for the trial judge to permit cross-examination of petitioner on his plea of the Fifth Amendment privilege before the grand jury. . . .'

And Mr. Justice Black, joined by the Chief Justice and Justices Douglas and Brennan, observed in a concurring opinion in *Grunewald:*

'. . . I can think of no special circumstances that would justify use of a constitutional privilege to discredit or convict a person who asserts it. The value of constitutional privileges is largely destroyed if persons can be penalized for relying on them.

'It seems peculiarly incongruous and indefensible for courts which exist and act only under the Constitution to draw inferences of lack of honesty from invocation of a privilege deemed worthy of enshrinement in the Constitution.' (353 US at page 425 and 426." [United States v Kemp, supra, at page 99.]

We may further support these conclusions by brief reference to Fagundes v United States, 340 F2d 673 (CA 1st Cir) (1965). Most appropriate is that portion of the opinion reading:

"But the Assistant United States Attorney did not undertake to use Fagundes's silence and request for counsel as an admission of guilt. His purpose in asking the questions was to cast doubt on Fagundes's credibility, that is, to suggest that his assertion of an alibi was an afterthought.

"When one takes the stand in his defense he of course puts his credibility as a witness in issue. Nevertheless we think it reversible error to permit evidence of refusal to talk and of request for counsel on arrest to be used for the purpose of impeachment. In the first place such evidence is ambiguous. Fagundes's words when arrested can as well be taken as indicating reliance upon constitutional rights as supporting an inference that his alibi was an afterthought. There is nothing to indicate which interpretation is more probable. Cf. Grunewald v United States, 353 US 391, 415–524, 77 S Ct 963, 1 L Ed 2d 931 (1957). In the second place we think it reversible error to permit a jury to draw any inference adverse to one accused of crime from his reliance upon his constitutional right to si-

lence and to the advice of counsel. The right to silence on arrest is akin to the right to decline to take the witness stand in one's own defense. Helton v United States, 221 F2d 338, 341–342 (CA 5, 1955)." [Fagundes v United States, supra, at page 677.]

On review, we once again adhere to the precept that pretrial reliance of the accused upon his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, by declining to make a statement, is inadmissible in evidence.

## II

By the same token, those very cases authored by this Court, hereinbefore discussed, require us to test the error for prejudicial effect. As we said in United States v Jones, supra, at page 23:

". . . we must inquire further into the circumstances of the case before us, for, while it be error to receive this portion of accused's statement, its effect is to be judged by the standard of specific prejudice as set forth in Code, supra, Article 59, 10 USC § 859. United States v Andrews, supra; United States v Workman, 15 USCMA 228, 35 CMR 200."

Recognizing this same requirement, the board of review in the case at hand reasoned:

"The Staff Judge Advocate, in his review, recognized the error in admitting evidence that accused refused to make a statement to Sergeant Odom. He advised the convening authority that '[a]ssuming this evidence were admissible for the limited purpose stated by trial counsel, it would appear that a necessary concomitance [sic] of its admission would be clear, specific limiting instructions on the part of the law officer'. Since the law officer failed to give such limiting instructions, the Staff Judge Advocate, noting that the evidence pertaining to the wrongful appropriation of the motor vehicle is 'anything but compelling', found this error to be prejudicial to the rights of accused and advised the convening authority to disapprove the findings of guilty of such offense and reassess the sentence accordingly. Thereafter, the convening authority, in his action, disapproved the findings of guilty of Specification 2 of Charge III and approved the sentence.

"In our view, this did not serve to remove the prejudice. Here, the evidence of accused's pretrial refusal to make a statement to Sergeant Odom was affirmatively and purposefully offered by the prosecution, rather than being admitted only incidentally as part of a general description of events (cf. U. S. v Hickman, 10 USCMA 568, 28 CMR 134; ACM S–20921, Bowser (M/Op), 33 CMR 844). The disclosure of the fact that accused claimed his privilege did not result from the unsolicited gratuitous comment of the witness. Nor were there instructions by the law officer to disregard it (cf. CM 408084, Skinner, 32 CMR 610). It should be remembered also that accused, in the instant case, defended on the ground of his mental condition. This was the central issue in the case. The purpose of the disclosure that accused had exercised his right to remain silent was to indicate that, rather than having a mental deficiency, accused was quite alert and capable of clear and sharp reasoning. Consequently, the prejudice stemming from the erroneous admission of the evidence as to accused's pretrial silence was not confined to one specification, but rather affected the entire case. The prejudice which flows from the erroneous admission of evidence of the pretrial silence of an accused is not limited to the specific offense concerning which accused was interrogated, where there is a fair risk that the court was affected in its deliberations concerning other offenses charged (cf. U. S. v Jones, *supra*)."

Government counsel insist prejudice flows only to the offense that is related to the inadmissible evidence. Thus, prejudice is discounted by the Gov-

ernment because of the convening authority's disapproval of the finding of guilty of the only offense purportedly affected by Sergeant Odom's testimony. It is said that such evidence could not, in any fashion, convey an inference of guilt of entirely unrelated offenses committed on earlier occasions. Moreover, all parties understood the limited purpose for which the sergeant's testimony was introduced—so say the Government.

We believe the board of review rationale to be fundamentally correct. The Government's argument overlooks the fact that, at the trial's very inception, defense moved for a finding of not guilty based on Kavula's lack of mental responsibility. Dr. Chasin, Dr. Gaberial, both psychiatrists, and Dr. Winder, a clinical psychologist, all testified that accused was either totally or substantially deprived of an ability to adhere to the right. The law officer's denial of this motion did not have the court's unanimous approval. As a consequence, the court itself voted on this interlocutory matter. Only then did the law officer's ruling prevail.

Nevertheless, following presentation of the case, and after final argument, this matter came before the court once again. The law officer advised the court that this same issue was still before them and that it related directly to the question of innocence or guilt. Cast in this light, they were then instructed in part:

"I realize that the issue of the accused's sanity was previously determined by you as an interlocutory matter. Nevertheless, the issue is still before you and relates directly to the question of the accused's guilt or innocence of the offenses charged. Therefore, unless you are satisfied beyond a reasonable doubt as to the mental responsibility of the accused for the offenses charged, the accused cannot legally be convicted of those offenses. A person is not mentally responsible in a criminal sense for an offense unless he was, at the time of the offense, so far free from mental defect, disease, or derangement as to be able concerning the particular act charged both to distinguish right from wrong and to adhere to the right. The phrase 'mental defect, disease, or derangement' comprehends irrational states of mind which are the result of deterioration, destruction, or malfunction of the mental, as distinguished from the moral, faculties. To constitute lack of mental responsibility the impairment must not only be the result of mental defect, disease, or derangement, but must also completely deprive the accused of his ability to distinguish right from wrong or to adhere to the right as to the acts charged."

Surely, in the absence of limiting instructions, no one can doubt the effect of erroneously admitted evidence upon this issue. It pierces the central theme of mental incapacity and is pertinent to each specification of every charge. Until then, this factual issue appeared substantially to be in equipoise. These circumstances demonstrate not only the existence of prejudice but portray its universal effect.

Accordingly, the certified issues are answered in the affirmative. The decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.