**UNITED STATES, Appellee,**

v.

**Wayne R. PHILPOT, Private First Class, U. S. Army, Appellant.**

No. 38860/AR.

SPCM No. 13925.

U. S. Court of Military Appeals.

Feb. 2, 1981.

1. The military judge granted appellant's motion for a finding of not guilty on a charge of possession of marijuana in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934.

For Appellant: *Captain James A. Mc-Atamney* (argued); *Colonel Edward S. Adamkewicz, Jr., Lieutenant Colonel John F. Lymburner, Major Grifton E. Carden* (on brief).

For Appellee: *Captain Paul G. Thomson* (argued); *Colonel R. R. Boller* (on brief); *Major Ted B. Borek, Major Douglas P. Franklin, Captain Paul G. Thomson.*

*Opinion of the Court*

EVERETT, Chief Judge:

Appellant was tried at Fort Campbell, Kentucky, before a special court–martial composed of officer members. Contrary to his pleas, he was found guilty of larceny of $60.00, in violation of Article 121, Uniform Code of Military Justice, 10 U.S.C. § 921.[1] His sentence was a bad–conduct discharge, confinement at hard labor for 5 months, forfeiture of $276.00 pay per month for 5 months, and reduction to the grade of Private E–1. Following approval by the convening authority, the findings and sentence were affirmed by the United States Army Court of Military Review without opinion. We granted review on this issue:[2]

> WHETHER THE APPELLANT WAS SUBSTANTIALLY PREJUDICED BY THE TRIAL COUNSEL'S REPEATED QUESTIONS AND COMMENTARY DESIGNED TO USE THE APPELLANT'S POST–ARREST SILENCE TO CONTRADICT HIS TESTIMONY AT TRIAL?

As will appear hereafter, the phrasing of the granted issue misleadingly characterizes the situation revealed by the record of trial. Instead of "post–arrest silence," the appellant gave incomplete and evasive answers. Under these circumstances, we must uphold the decision of the court below.

2. A second issue, specified by this Court (9 M.J. 138), was resolved adversely to the appellant in *United States v. Salley,* 9 M.J. 189 (C.M. A.1980).

I

Private First Class Stafford testified that on the evening of November 3, 1978, he had imbibed several drinks, after which he went to his room. Since the door was locked, he borrowed from appellant a coat hanger with which to open his door. Appellant, whom he had known for six months and who lived nearby on the same floor, accompanied Stafford to his room. Philpot left for the ostensible purpose of obtaining his camera and then returning to take a picture in Stafford's room.

Stafford laid his head on his desk and pretended to be asleep. The reason for this subterfuge was, "I got ripped off some time before and I just wanted—I just more or less wanted to see if he could have been the one." When appellant returned with his camera, Stafford saw "some flashes out the corner of my eye." "Then someone came over and jabbed me in my ribs on the left side and about two three times"; but "I just laid there like I was asleep." According to Stafford's account,

> Then I felt somebody reaching in my— bringing out my billfold and then after— afterwards they were—well, then I heard footsteps walking away and when I heard them I kind of raised up and look [sic] into the mirror and I seen [sic] Philpot as he was shutting the door.

After a few minutes Stafford reported these events to Sergeant Francisco, who called the first sergeant. Subsequently, Lieutenant Rawcliffe, the battalion staff duty officer, arrived and in Sergeant Francisco's presence, Stafford delivered to him a list of the serial numbers of the bills that he had had in his wallet at the time of the theft. Stafford explained that he had prepared the list on November 2—"a day after payday"—[b]ecause I got ripped off before and I didn't have my serial numbers wrote [sic] down."

When Special Agent Peter Black of the Criminal Investigation Division (CID) commenced his investigation of the larceny shortly after midnight on the morning of November 4, he heard Stafford's version of the events and then proceeded to Philpot's room to place him under apprehension for burglary and larceny. Subsequent to the apprehension, he searched appellant's person, pulled out his wallet, and found three twenty dollar bills. Their serial numbers matched those on the list which by then had been turned over to Black by Lieutenant Rawcliffe.

Although CID Agent Black had been present for an Article 39(a), 10 U.S.C. § 839(a) session in the appellant's proceedings, he was away on emergency leave at the time of this trial. However, the Government offered a stipulation of his expected testimony. In addition to a narration of the discovery in appellant's wallet of the three bills which matched the list of serial numbers that Stafford had prepared, Black described how Philpot, after a full warning, had waived his Article 31, 10 U.S.C. § 831 rights and his right to counsel

> and agreed to answer my questions. I specificall[y] asked PFC PHILPOT about the three (3) twenty (20) dollar bills which I had found inside his wallet. PFC PHILPOT stated that he was aware that these same above—described three (3) twenty (20) dollar bills were inside his wallet. PFC PHILPOT explained that he had obtained these particular bills from an individual or individuals in payment for bills. PFC PHILPOT was unable to identify this individual or individuals.

In his testimony, Lieutenant Rawcliffe described Philpot's explanation in this manner:

> A. Yes, he made a statement in reply to Mr. Black's question of how he came about with so much money and where did he get so much money.
>
> Q. And who asked that question?
>
> A. Mr. Black.
>
> Q. And what was Private Philpot's response to the question, "How did you come about this much money?"
>
> A. Not quoting, three words, I can't quote, friends paid me.
>
> Q. Friends paid me?

A. Friends paid me.

Q. Now that's what Private Philpot told Mr. Black in your presence?

A. That's correct.

Q. Was there any other statement by Private Philpot which identified these friends?

A. No, sir.

Q. Was Private Philpot in your presence at (sic), "Who are these friends?" or "Can you identify these friends who paid you?"

A. I don't remember. I remember friends paid me, that's what I remember. I don't recall any names or any question directing any names in reply.

To rebut the government's case, the defense first called Specialist Wright, appellant's roommate, who described a game of craps in June 1978, in which he, Philpot, and Stafford had been the players. Wright had won $65 to $70; Philpot had come out about even; and Stafford had been the loser. The evidence concerning this game in June 1978 was apparently intended by the defense to suggest that, because of resentment over his losses, Stafford was making a false accusation against Philpot in November.

When appellant took the stand, he described on direct examination how Stafford had invited him to bring down his Polaroid camera and take some pictures of Stafford's roommate, who had passed out naked and was lying in bed drunk at the time. Philpot had taken three pictures because he thought "it would cause a big laugh in the barracks then when the pictures . . . were showed around." Two of these pictures were offered in evidence as defense exhibits. Thereafter, he and Stafford had played craps, with appellant being the victor to the tune of about $70. After some forty–five minutes of playing craps with Stafford, appellant returned to his own room close to midnight. The appellant stated that it was possible that Stafford had become so upset over his losses that evening that he was now falsely accusing the appellant of larceny. Concerning his discussion of the incident with Agent Black, appellant had this to say:

Q. So PFC Philpot, when you told Black that you didn't know anything about a larceny or a wallet, you–did you tell him that?

A. Yes, sir.

Q. Were you telling the truth when you told him that?

A. Yes, sir.

Q. Did you at the time realized [sic] that it involved an allegation revolving around your crap game with Stafford?

A. No, sir.

Q. Mr. Black didn't go into any details with you, did he?

A. No, sir.

The following extensive portion of the record of the appellant's testimony, beginning with trial counsel's cross–examination, is quoted in order to put into proper focus the scenario giving rise to the assigned error:

\* \* \* \* \* \*

Q. Isn't it correct that he apprehended you shortly after he arrived for suspicion of burglary and larceny?

A. Yes, sir.

Q. And pursuant to that apprehension he searched you and found three twenty dollar bills in your wallet, is that right?

A. Yes, sir.

Q. You were also there when Black, the Agent, was handed a slip of paper by Lieutenant Rawcliffe, were you not?

A. Yes, sir.

Q. And before he was handed the slip of paper, didn't he ask you when he found the twenties, how you came across this money?

A. Yes, sir.

Q. He had already advised you of your rights, hadn't he?

A. Yes, sir.

Q. And you didn't want a lawyer?

A. Right, sir.

Q. You said you wanted to make a statement about this?

A. Right, sir.

Q. You wanted to answer his questions truthfully?

A. (The witness nodded in the affirmative.)

Q. Did he ask you a question, words to the effect, "How did you come across this money. How did you get it"?

A. I told him debts.

Q. Debts.

A. I don't know where he got that other statement from.

Q. You've heard the stipulation which was admitted into evidence and you were asked about those twenty dollar bills and the testimony was that you explained you had obtained the particular bills, the twenty dollar bills from individuals, isn't that right?

A. For debts.

Q. People owing you money?

A. No, I just said, "Debts," and he said, "From people," and I said, "Yes."

Q. You heard Lieutenant Rawcliffe on the stand testify that he heard you say, "I was paid by friends. Friends paid me."

A. That's still three different statements.

Q. Three different statements?

A. Mine, Sergeant Black and his.

Q. Black testified that you obtained these twenty dollar bills from individuals who you were unable to identify. Are you saying that's a lie?

A. I said debts. That's what I said when he asked me.

Q. You agree that that's what you told Black that you got it from debts or for bills from individuals but you could not identify who they were?

A. Right.

Q. That was a lie wasn't it?

A. I told him—when he asked me where I got the money I said, "Debts." He said, "From who?" I said, "Just debts."

Q. You will [sic] not tell him?

A. Right.

Q. But you come into court, are you not, and you're telling the jury that the twenty dollar bills that have been admitted into evidence that were found on your person on 3rd November, now you're telling them you gained these twenty dollar bills from a crap game from Stafford, is that right?

A. It was for debts.

Q. It's what?

A. Debts.

Q. Money you win from a crap game is called a debt?

A. That's right, sir.

Q. You've already been paid the money at the time of the game, isn't that right?

A. That's right.

Q. After the serial numbers were supplied to you by Mr. Black by Lieutenant Rawcliffe, were you not present when he examined the serial numbers on this list, Prosecution 2, with the bills that he found in your wallet?

A. Right, sir.

Q. And you saw that they matched?

A. Yes, sir.

Q. Did he not tell you that these were the bills that were the suspected larceny? These bills were the ones that Stafford was accusing you of stealing?

A. I don't remember, sir.

Q. Did you get that impression since he compared the serial numbers?

A. Yes, sir.

Q. So that was what was going through your mind, that hey, this guy thinks that I stole the sixty dollars. Isn't that a fair statement? Isn't that what you thought?

A. Right, sir.

Q. And all you said is, "I was paid by friends," or, "I was paid from people who owed me debts," isn't that right?

A. All I said was debts, sir.

Q. You said what?

A. "Debts."

\* \* \* \* \* \*

Q. And he said, "From whom" and you couldn't answer?

A. I just say, "Just debts."

Q. You refused to answer anything further.

A. Yes.

Q. Wouldn't it have been reasonable at that point Private Philpot knowing that you've already been apprehended; been advised by a law enforcement officer that you don't have to make any statements; you don't have to talk or answer any questions but you go ahead and agree to answer questions and when he asked you a question and it's clear in your own mind that the money he's talking about is the subject of larceny, wouldn't it have been reasonable for you to explain to him that hey, I got this in a crap game from Stafford?

DC: Your Honor, we think that this is getting awfully close to the edge of the defendant's Article 31 rights which at least he chose to exercise at that point during the interrogation by Mr. Black. The defense feels at this point this may very well be commentary upon an exercise of his rights by the defendant and would be objectionable.

MJ: I don't see it in that light. I see it as being proper inquiry into why the accused made the statements that he did at that particular time. You may raise that objection at a subsequent time if it appears that it's appropriate but the objection if overruled at this time.

Q. Let me rephrase it and reset the stage. You are in your own room. Black has just apprehended you for suspicion of burglary and larceny. He's advised you of your rights. You waive your rights and agree to answer questions. He asks you how you came across the twenty dollar bills, Prosecution 10, 11, and 12, and you say, "Debts."

A. Yes.

Q. From individuals you are unable to identify.

A. No, I didn't say all that.

Q. Well, he asked you who they were and you did not respond, is that correct?

A. Right, sir.

Q. And Lieutenant Rawcliffe testified that you made the statement, "Friends paid me," are you saying that that is a misstatement on Rawcliffe's part?

A. I don't remember saying that, sir.

Q. You heard Lieutenant Rawcliffe testify?

A. Yes, sir.

Q. Alright, now, at that stage of the game, you testified earlier that you knew the sixty dollars, the three twenty dollar bills you were being questioned about were the same twenty-sixty dollars total that Stafford was missing and yet at that point even though you had an opportunity to explain the story about a crap game with Stafford, you didn't go into that with Black, did you?

A. I didn't know whether he'd believe it or not.

Q. Pardon me.

A. I didn't know whether he'd believe it or not. I had the right to remain silent.

Q. You didn't know whether he would believe you?

A. Right, sir.

Q. Is it not correct that you waived your rights and agreed to talk to Black?

A. What do that mean, sir?

Q. When he read you your rights under Article 31 and asked you if you wanted a lawyer and you declined, wasn't that correct?

A. Right, sir.

Q. And when he said, "Now would you like to answer some questions about this offense," you said, "Yes, I would. I will answer questions."

A. Right, sir.

Q. And after the questions had started by Agent Black you said you got these sixty dollars, three twenty dollar bills, from debts and yet you did not go any further, isn't that correct?

A. Right, sir.

Q. You had an opportunity at that point to make your—tell your story to Black, did you not?

A. I wanted a lawyer to be present, sir.

Q. At no time did you tell Black, did you?

A. No, sir.

Q. Did Agent Black ever interrupt you in any way; stop you from telling this full story you're telling the court today?

A. He was doing a lot of talking, using these big words that I know nothing about.

Q. Did you ever try to explain and tell the story about the crap game on any prior occasion other than today in court?

A. To Captain Hearnsberger, sir, and my defense counsel.

Q. But you didn't do it when you were confronted by Agent Black who advised you of your rights and you waived them, you didn't tell Black right then, did you?

A. No, sir.

Q. Isn't it the reason why you didn't tell him at that point is because this is all a fabrication you made up prior to coming to court?

A. No, sir.

Q. So you expect the jury to believe it's not a fabrication, isn't that correct?

A. Right, sir.

Q. You also expect the jury to believe that Stafford falsely is accusing you because he was upset losing money?

A. I didn't say why, sir. I don't know why he did it. I asked him, he said he don't know. He said all he wanted was his money back.

Q. Because you took it?

A. Like gambling that's all.

Q. You gambled with Stafford before, is that right?

A. Right, sir.

\*    \*    \*    \*    \*    \*

### REDIRECT EXAMINATION

Questions by the defense:

\*    \*    \*    \*    \*    \*

PFC Philpot, you've known Stafford for a while, haven't you?

A. Yes, sir.

Q. Stafford's really a pretty quite [sic] guy, isn't he?

A. Yes, sir.

Q. He's not the kind of guy that you'd expect to jump up and down and yell when he gets mad, is he?

A. No, sir.

Q. So a lot of times he wouldn't show his anger based on your knowledge of him, don't you think?

A. Right, sir.

Q. You consider gambling debts a form of debt?

A. Right, sir.

Q. So when you made your statement to Mr. Black you meant what?

A. Debts, sir.

Q. You meant that Stafford had owed you money and had paid off, is that what you meant?

A. No, sir.

Q. What did you mean?

A. Debts.

Q. From gambling?

A. Right, sir.

Q. And he had paid off to fulfill those debts?

A. That's right, sir.

Q. Now there was a lot going on when Mr. Black was talking to you, wasn't there?

A. A lot, sir.

Q. Were there a lot of people in the room?

A. Two or three.

Q. Was Black saying a lot of things to you?

A. Yes, sir.

Q. Did you understand everything that he was saying?

A. No, sir.

Q. Did you get scared?

A. Yes, sir.

Q. Did you intend to invoke your Article 31 rights to remain silent?

TC: Your Honor, I would object at this point. The defense continues to lead its own witness. As far as, "Were you scared," and so on and so on, Your Honor.

MJ: Alright, the objection is overruled as to questions which have already been asked and answered but the point is well taken and please let the witness testify.

DC: Thank you, Your Honor.

Q. Why did you not answer his question when he asked you who paid you?

A. Because it was Stafford.

Q. And you thought what?

A. That Stafford was trying to pull something on me.

Q. Have you been told about gambling in the barracks?

A. No, sir.

Q. Now you told Captain Hearnsberger part of the story, didn't you?

A. Yes, sir.

Q. Did you tell him every detail that you've told the court today?

A. No, sir.

Q. And why is that?

A. He didn't ask, sir.

DC: No further questions.

MJ: Further cross.

TC: Very briefly, Your Honor.

#### RECROSS–EXAMINATION

Questions by the prosecution:

Q. PFC Philpot, you testified that the reason—what you thought when Black was talking to you, the reason you didn't say anything was–what was it now? Stafford was trying to pull something on you?

A. Could have, sir. I seen Stafford standing outside.

Q. So you knew Stafford was involved, right?

A. Right, sir.

Q. You knew it was his money they were looking for, right?

A. Yes, sir.

Q. And you just won this money from Stafford, according to your own testimony?

A. Right.

Q. You thought Stafford was trying to pull something over on you?

A. Yes, sir.

Q. You didn't give any of that indication to Agent Black?

DC: Your Honor, the defense is going to object on accumulativeness. I think we've been through this once before, if my recollection is correct.

MJ: The objection is overruled. Prosecution may proceed.

Q. Even though you knew all this about the gambling for forty five minutes with Stafford, knowing in your own mind that you thought he might have been upset and was falsely accusing you because he had lost sixty dollars to you, not one word of that was told to Agent Black, isn't that right?

A. Right, sir.

Q. You didn't withhold telling this information to Agent Black because you thought gambling was wrong, did you?

A. No, sir.

Q. You didn't even know there was any kind of prohibition against gambling in the barracks?

A. Right, sir.

## II

■ The Manual for Court–Martial provides, "The fact that on official questioning the accused, in the exercise of his rights under Article 31(b) or its civilian counterpart . . . remained silent or refused to answer a certain question is inadmissible against him." Para. 140a(4), Manual for Courts–Martial, United States, 1969 (Revised edition). This rule had been presaged by our decisions in cases like *United States v. Stegar*, 16 U.S.C.M.A. 569, 37 C.M.R. 189 (1967); *United States v. Kavula*, 16 U.S.C.M.A. 468, 37 C.M.R. 88 (1966); and *United States v. Andrews*, 16 U.S.C.M.A. 20, 36 C.M.R. 176 (1966). The underlying rationale accords with *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957).[3]

In the case at hand, the difficulty with appellant's position is that the record does not suggest a refusal to answer a certain question, but instead reflects the giving of an incomplete answer. Under such circumstances–as the military judge correctly perceived at trial–the impeachment is by a prior inconsistent statement, not by silence. *Anderson v. Charles*, 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980). *See United States v. Goldman*, 563 F.2d 501 (1st Cir. 1977), *cert. denied*, 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 768 (1978); *Twyman v. Oklahoma*, 560 F.2d 422 (10th Cir. 1977), *cert. denied*, 434 U.S. 1071, 98 S.Ct. 1254, 55 L.Ed.2d 774 (1978). Utterance of a half–truth is not the equivalent of a refusal to answer a question, even though some portion of the truth is omitted. In *Anderson v. Charles, supra* at 2181, the Supreme Court observed:

> Each of two inconsistent descriptions of events may be said to involve "silence" insofar as it omits facts included in the other version. But *Doyle* does not require any such formalistic understanding of "silence," and we find no reason to adopt such a view in this case.

Similarly, to uphold the appellant's contention in the case at bar would require a "formalistic understanding" of terms like "remained silent or refused to answer a certain question." Instead of relying on his Article 31(b) rights–for which he could not have been penalized by cross–examination about reliance–appellant provided an evasive and incomplete answer to Agent Black. Under the circumstances, that answer was inconsistent with appellant's testimony at trial that he had won the $60.00 from Stafford that evening in a game of chance. The prior inconsistent statement was a proper subject both for cross–examination, para. 153b(2)(C), Manual, *supra*, and for argument.

## III

The decision of the United States Army Court of Military Review is affirmed.

Judges COOK and FLETCHER concur.

---

**3.** Recently the Supreme Court limited *Doyle v. Ohio* to situations of custodial interrogation, where a warning is required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 54 L.Ed.2d 86 (1980). In other situations, a criminal defendant who testifies in his own defense may be impeached by cross–examination about his pre–arrest silence. *Id.* However, since Article 31(b) requires that a warning accompany official questioning of a suspect–even when he is not in custody–silence in the face of such questioning may be no more than a reliance on the warning; and so–under the logic of *Doyle v. Ohio*, as explained in *Jenkins v. Anderson*–an accused in a court–martial is still entitled to object to cross–examination about remaining silent or about declining to answer a question when, before trial, he was interrogated or was requested to make a statement.